Appeal No. 2016-2370

# United States Court of Appeals
*for the*
# Federal Circuit

OPEN PARKING, LLC,

*Plaintiff-Appellant,*

– v. –

PARKME, INC.,

*Defendant-Appellee.*

APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF PENNSYLVANIA, CASE NO. 2:15-CV-00976-MRH
HONORABLE MARK R. HORNAK

## BRIEF FOR PLAINTIFF-APPELLANT

STANLEY M. STEIN
STANLEY M. STEIN, PC
445 Fort Pitt Boulevard, Suite 150
Pittsburgh, Pennsylvania 15219
(412) 904-4573

*Attorney for Plaintiff-Appellant*

September 19, 2016

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

OPEN PARKING, LLC **v.** PARKME, INC.

Case No. 16-2370

## CERTIFICATE OF INTEREST

Counsel for the:
☐ (petitioner) ☒ (appellant) ☐ (respondent) ☐ (appellee) ☐ (amicus) ☐ (name of party)

Open Parking, LLC

certifies the following (use "None" if applicable; use extra sheets if necessary):

| 1. Full Name of Party Represented by me | 2. Name of Real Party in interest (Please only include any real party in interest NOT identified in Question 3) represented by me is: | 3. Parent corporations and publicly held companies that own 10 % or more of stock in the party |
|---|---|---|
| Open Parking, LLC | Not applicable. | None. |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

4. The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court (**and who have not or will not enter an appearance in this case**) are:

Stanley M. Stein, PC; Stanley M. Stein, Esq.; George C. Thompson

Aug 4, 2016
Date

/s/ Stanley M. Stein
Signature of counsel

Please Note: All questions must be answered

Stanley M. Stein
Printed name of counsel

cc: counsel of record via CM/ECF

Reset Fields

# TABLE OF CONTENTS

**Page**


TABLE OF AUTHORITIES .......... ii

I. BACKGROUND .......... 1

II. STATEMENT OF RELATED CASES .......... 3

III. JURISDICTIONAL STATEMENT .......... 3

IV. STATEMENT OF THE ISSUES .......... 3

V. STATEMENT OF THE CASE .......... 3

VI. STATEMENT OF THE FACTS .......... 4

VII. SUMMARY OF THE ARGUMENT .......... 8

VIII. ARGUMENT .......... 10

- A. Standard of review .......... 10
- B. Framework for determining patent-eligibility .......... 11
- C. The district court incorrectly found the claims of the patents to be patent-ineligible .......... 16
  - 1. At step one, the claims of the patents are directed to patent-eligible subject matter .......... 16
  - 2. At step two, the claims of the patents recite inventive concepts and therefore are patent-eligible .......... 25

IX. CONCLUSION AND STATEMENT OF RELIEF SOUGHT .......... 41

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Alice Corp. Pty. Ltd. v. CLS Bank Int'l*,
134 S. Ct. 2347 (2014) ........................................................... *passim*

*Bascom Global Internet Servs., Inc. v. AT&T Mobility LLC*,
No. 2015-1763, slip op. (Fed. Cir. June 27, 2016) ................. *passim*

*DDR Holdings, LLC v. Hotels.com, L.P.*,
773 F.3d 1245 (Fed. Cir. 2014) ......................................... 10, 12, 35

*Electric Power Group, LLC v. Alstom S.A.*,
No. 2015-1778, slip op. (Fed. Cir. Aug. 1, 2016) .................... *passim*

*Enfish LLC v. Microsoft Corp.*,
822 F.3d 1327 (Fed. Cir. 2016) .............................................. *passim*

*In re Bilski,*
545 F.3d 943 (Fed. Cir. 2008), *aff'd sub nom.,*
*Bilski* v. *Kappos,* 130 S. Ct. 3218 (2010) ....................................... 26

*In re Donald J. Trump Casino Sec. Litig.*,
7 F.3d 357 (3d Cir. 1993)............................................................... 10

*In re TLI Commc'ns LLC Patent Litig.*,
823 F.3d 607 (Fed. Cir. 2016) ...................................... 12, 26, 35, 36

*Mayo Collaborative Servs. v. Prometheus Labs., Inc.*,
132 S. Ct. 1289 (2012) ................................................................... 12

*McRO, Inc. v. Bandai Namco Games America*,
No. 2015-1080, slip op. (Fed. Cir. Sep. 13, 2016)............... 12, 13, 18

*OIP Techs., Inc. v. Amazon.com, Inc.*,
788 F.3d 1359 (Fed. Cir. 2015) ..................................................... 10

**Statutes & Other Authorities:**

28 U.S.C. § 1295(a)(1).......................................................................... 3

28 U.S.C. § 1331 ..................................................................................... 3

28 U.S.C. § 1338(a) .......... 3
35 U.S.C. § 101.......... *passim*
35 U.S.C. § 102.......... 28, 29
35 U.S.C. § 103.......... 26, 28, 29
35 U.S.C. § 282.......... 15
Fed. Cir. R. 47.5(a).......... 3
Fed. Cir. R. 47.5(b).......... 3
Fed. R. Civ. P. 12(b)(6) .......... 4, 10, 41

## I. BACKGROUND

Parking at the Vienna Metro Station was a problem that could have been avoided by the inventor simply by leaving for work earlier each morning. Rather than succumbing to the notion that finding parking is just one of life's many human problems to be avoided, the inventor reformulated the human problem of finding open parking as the technical problem of how to receive and view the real-time changing occupancy condition of the parking lot at the Vienna Metro Station while sitting in traffic on Route 66. This objectively technical problem could not be solved by mental steps or with pencil and paper, and there was no human attendant at the Vienna Metro Station parking lot. Back in 1999, the solution to the inventor's objectively technical problem required improved technology, and the inventor described and enabled inventive technological tools that improved parking system, computer, and network technology and that solved his objectively technical problem in the patent applications that ultimately issued into the patents-in-suit.

The patents-in-suit describe an Internet-based parking system and claim inventive combinations of technical elements (specific hardware, parking system software, technical processing, and technical parking

data received over the Internet and applied in the technical processing) that implement the network infrastructure components of the Internet-based parking system, which were novel, non-generic, non-conventional, and non-obvious at the time of the invention.

The claims embody inventive technological tools including new computer-implemented sources of technical parking data and new types of technical parking data applied in new technical processes. The patents and claims clearly set forth and describe how such new and inventive technological tools interact and work to implement a particular concrete technological solution to an objectively technical problem that does not attempt to monopolize every potential solution to the problem in general.

In finding all of the claims patent-ineligible under § 101, the district court described a single claim untethered from its language and at its highest level of abstraction, mischaracterized the problem to be solved, ignored the technical elements of the claimed technological solutions, relied on inapposite evidence, and disregarded or erroneously applied the law of this Court as to what is an abstract idea and what is an inventive concept. Therefore, the judgment of the district court should be reversed.

## II. STATEMENT OF RELATED CASES

Pursuant to Federal Circuit Rules 47.5(a) and (b), appellant states that there have been no other appeals in this civil action before this or any other appellate court and that there are no cases known to counsel to be pending in this or any other court that will directly affect or be directly affected by this Court's decision in the pending appeal.

## III. JURISDICTIONAL STATEMENT

The district court had jurisdiction under 28 U.S.C. §§ 1331 and 1338(a). This Court has jurisdiction under 28 U.S.C. § 1295(a)(1). The judgment or order appealed from is final.

## IV. STATEMENT OF THE ISSUES

The single issue presented for review is whether the district court erred in finding the claims of the patents-in-suit not to be patent-eligible under 35 U.S.C. § 101.

## V. STATEMENT OF THE CASE

Open Parking, LLC ("Open Parking") filed an action for patent infringement against ParkMe, Inc. ("ParkMe") on July 29, 2015, Appx22, and filed an amended complaint on October 13, 2015, Appx22. The patents at issue in this case are U.S. Patent No. 6,501,391 (the '391

patent), Appx27-39, and U.S. Patent No. 6,750,786 (the '786 patent), Appx40-50. On November 2, 2015, ParkMe moved to dismiss the amended complaint pursuant to Fed. R. Civ. P. 12(b)(6) on the theory that the claims of the '391 patent and the '786 patent did not cover patent-eligible subject matter under § 101. Appx65. On March 8, 2016, the district court heard oral arguments on the motion. Appx224-225. The parties subsequently filed supplemental briefs to address new issues raised at the oral arguments by Open Parking and by ParkMe. Appx25. On June 30, 2016, the district court issued an order granting ParkMe's motion, and entered judgement the same day. Appx25. Open Parking timely filed this appeal seeking reversal of the district court's finding that the patents-in-suit are not patent-eligible under § 101.

## VI. STATEMENT OF THE FACTS

Open Parking owns the '391 patent and the '786 patent, which are both entitled to the priority date of U.S. provisional patent application 60/156,391 (the '391 application) that was filed on September 28, 1999, and is titled "Internet Communication of Parking Lot Occupancy Information." Appx40. The '391 application, the '391 patent, and the '786

patent enable and describe a new Internet-based parking system as a novel advance over the prior art. *See e.g.*, Appx35.

The patents describe and claim inventive technical elements and inventive combinations of technical elements (specific hardware, parking system software, technical processing, and technical parking data received over the Internet and applied in the technical processing) that implement the specific network infrastructure components of the new Internet-based parking system.

As to the parking system components that interface with a remote commuter, the '391 application enables and describes the invention of:

> A portable wireless remote graphical display device structured and arranged to access the Internet from home, office, vehicle, or any other location comprising a specific software application on the portable wireless remote graphical display device for commanding a server at a parking lot or remote location to transmit parking lot occupancy data corresponding to one or more parking lots over the Internet to the portable wireless remote graphical display device and for receiving and displaying the parking lot occupancy data on the portable wireless remote graphical display device as a real-time representation of the parking lot indicating vacant parking spaces within the parking lot.
>
> Appx3.

Open Parking's patents solve the objectively technical problem of communicating real-time parking lot occupancy information to remote

commuters in advance of their arrival at a physical parking lot, a problem which cannot be solved by mental steps, with pencil and paper, or by purely human intra-personal or inter-personal activity.

The claims of the ’391 patent and the ’786 patent recite meaningful claim limitations that constitute significant distinguishing technical features over prior art parking systems, conventional computer and network technology at the time of the invention, and any allegedly abstract idea such as moving or shuffling data from one place to another and/or the collection, analysis and display of available information in a particular field.

The distinguishing technical features in the claims constitute technical tools that improve parking system technology and result in a particular concrete technological solution to the objectively technical problem of communicating real-time parking information to remote commuters in advance of their arrival at a physical parking lot.

The distinguishing technical features in the claims are significantly more than merely moving or shuffling parking data and/or the collection, analysis and display of parking information using the Internet and

generic computers performing well-understood, routine and conventional activities previously known to the industry.

The claims are limited to technical means that achieve a technical result and improve over parking system technology and conventional computer and network technology at the time of the invention. The claims are presumed valid over the patented prior art parking systems identified in the background section of the specifications, as well as the references considered by the Examiner during the prosecution of the ’391 patent and the ’786 patent, and over conventional computer and network technology at the time of the invention.

Despite Open Parking having stated that it “does not imply and explicitly does not concede that all claims fall together,” Appx4, proffering its own plausible claim construction, Appx5-6, and arguing for patent-eligibility of the independent and dependent claims in a manner that “heavily emphasizes the novelty and unconventional-ness of the invention,” Appx18, the district court considered only claim 1 of the ’786 patent while ignoring its technical features, Appx4, disregarded Open Parking’s proposed claim constructions, Appx6, and did not thoroughly analyze the claims under this Court’s controlling precedents.

## VII. SUMMARY OF THE ARGUMENT

The district court erred in finding the claims of the patents-in-suit not to be patent-eligible under 35 U.S.C. § 101 when applying the two-step patent-eligibility test set forth by the Supreme Court in *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 134 S. Ct. 2347, 2355 (2014) ("*Alice*"). At step one, the district court determined: "Essentially, the patents are aimed at moving data (open parking spots or not, and maybe where they are) from one place (the parking lot) to another (the driver's location). That is an abstract idea." At step two, the district court determined: "At bottom, the '391 and '786 Patents describe the shuffling of one type of data over the Internet and with generic computer technology." The district court concluded: "Those basic computer functions are not directed to a computer-centric problem and thus are not patent-eligible under *Alice* and § 101."

The claims are directed to new and inventive technological tools implemented by combinations of technical elements (specific hardware, parking system software, technical processing, and technical parking data received over the Internet and applied in the technical processing) that improve parking system and computer technology and have the

technical effect of a particular concrete technical solution to the objectively technical problem of communicating real-time parking information to remote commuters in advance of their arrival at a physical parking lot, which cannot be solved by pencil and paper, mental steps, or any purely human intra-personal or inter-personal activity. Consequently, the claims are directed to patent-eligible subject matter and pass step one of the *Alice* patent-eligibility framework.

Moreover, the claims include inventive technical elements as well as inventive ordered combinations of technical elements (specific hardware, parking system software, technical processing, and technical parking data received over the Internet and applied in the technical processing) that solve the objectively technical problem (communicating real-time parking information to remote commuters in advance of their arrival at a physical parking lot) by way of a limited and specific implementation, which was not conventional or generic at the time of the invention and which ensures that the claims are significantly more than applying an alleged abstract idea (moving or shuffling data from one place to another and/or the collection, analysis and display of available information in a particular field) on the Internet and using generic

computers performing well-understood, routine and conventional activities previously known to the industry. Consequently, the claims of the patents recite inventive concepts and therefore are patent-eligible under step two of the *Alice* framework. For the forgoing and following reasons, therefore, the judgment of the district court should be reversed.

## VIII. ARGUMENT

### A. Standard of review

This court reviews a district court's dismissal for failure to state a claim under the law of the regional circuit. *See OIP Techs., Inc. v. Amazon.com, Inc.*, 788 F.3d 1359, 1362 (Fed. Cir. 2015). The Third Circuit reviews challenges to a dismissal for failure to state a claim under Fed. R. Civ. P. 12(b)(6) *de novo*, taking the allegations of the complaint to be true. *In re Donald J. Trump Casino Sec. Litig.*, 7 F.3d 357, 366 (3d Cir. 1993). This court reviews the district court's determination of patent eligibility under § 101 *de novo*. *See DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245, 1255 (Fed. Cir. 2014) ("*DDR*").

### B. Framework for determining patent-eligibility

Under 35 U.S.C § 101, patent-eligible subject matter includes "any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof."

The judicial exclusions from § 101 are for "[l]aws of nature, natural phenomena, and abstract ideas." *Alice*, 134 S. Ct. at 2354. The rationale for the exclusions is "one of pre-emption," namely a "concern that patent law not inhibit further discovery by improperly tying up the future use of these building blocks of human ingenuity." *Id.* (quotation marks omitted). Courts, however, must "tread carefully in construing this exclusionary principle lest it swallow all of patent law." *Id.*

The Supreme Court has "set forth a framework for distinguishing patents that claim laws of nature, natural phenomena, and abstract ideas from those that claim patent-eligible applications of those concepts." *Id.* at 2355. At step one, the Court must "determine whether the claims at issue are directed to one of those patent-ineligible concepts." *Id.* If the answer at step one is "yes," the Court must further "consider the elements of each claim both individually and 'as an ordered combination' to determine whether the additional elements 'transform the nature of the

claim' into a patent-eligible application." *Id.* at 2355 (quoting *Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 132 S. Ct. 1289, 1297 (2012) ("*Mayo*")). Step two determines whether the claims include an "inventive concept" that is "sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the ineligible concept itself." *Id.* (quoting *Mayo*, 132 S. Ct. at 1297) (modification marks omitted).

This Court has provided guidance for § 101 determinations as to software-based inventions in *DDR*, 773 F.3d 1245, and recently in *Enfish LLC v. Microsoft Corp.*, 822 F.3d 1327 (Fed. Cir. 2016) ("*Enfish*"), *In re TLI Commc'ns LLC Patent Litig.*, 823 F.3d 607 (Fed. Cir. 2016) ("*TLI*"); *Bascom Global Internet Servs., Inc. v. AT&T Mobility LLC*, No. 2015-1763, slip op. (Fed. Cir. June 27, 2016) ("*Bascom*"), *Electric Power Group, LLC v. Alstom S.A.*, No. 2015-1778, slip op. (Fed. Cir. Aug. 1, 2016) ("*Electric Power Group*"), and *McRO, Inc. v. Bandai Namco Games America*, No. 2015-1080, slip op. (Fed. Cir. Sep. 13, 2016) ("*McRO*").

This Court has found software-related patents eligible under *Alice* step one and has made clear that step one is a potential stopping point and that a substantial class of claims is not directed to patent-ineligible

concepts. *Enfish*, 822 F.3d at 1339. This Court has stated that the "directed to" inquiry filters claims, in light of the specification, based on whether the "focus" of the claims and "their character as a whole" is directed to excluded subject matter but does not simply ask whether the claims "involve" a patent-ineligible concept. *Id.* at 1335-36.

This Court has noted that the Supreme Court suggested that claims "purport[ing] to improve the functioning of the computer itself," or "improv[ing] an existing technological process" might not succumb to the abstract idea exception. *Id.* at 1335 (*quoting Alice*, 134 S. Ct. at 2358–59).

At step one of the *Alice* analysis, this Court had sometimes incorporated claim limitations into its articulation of the idea to which a claim is directed if the claims could be understood, in light of their specific limitations, to be unambiguously directed to an improvement in computer capabilities. *Id.* at 1335. If, however, the claims and their specific limitations did not readily lend themselves to a step-one finding that they were directed to a non-abstract idea and presented a "close call" about how to characterize what the claims are "directed to," consideration of the specific claim limitations' narrowing effect was deferred until step two. *Id.* at *13. Recently, in *McRO*, 2015-1080, slip op. at *21, this Court

held that "[w]hether at step one or step two of the *Alice* test, in determining the patentability of a method, a court must look to the claims as an ordered combination, without ignoring the requirements of the individual steps."

This Court has recognized that "software can make non-abstract improvements to computer technology," *Enfish,* 822 F.3d at 1335, and that a "software-based invention" can "improve[ ] the performance of the computer system itself," *Bascom*, No. 2015-1763, slip op. at *18, and can be read to "improve[ ] an existing technological process." *Id.* at *17 (*citing Alice*, 134 S. Ct. at 2358).

This Court has described step two as looking more precisely at what the claim elements add and scrutinizing the claims "more microscopically" to determine whether they identify an inventive concept. *Electric Power Group*, No. 2015-1778, slip op. at *8.

In evaluating whether there is an "inventive concept" in a claim, courts must "consider the elements of each claim both individually and 'as an ordered combination' to determine whether the additional elements 'transform the nature of the claim' into a patent-eligible application." *Alice*, 134 S. Ct. at 2355. This inquiry looks to the presence

of "an element or combination of elements that is 'sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the [ineligible concept] itself.'" *Id.* (modification in original). An "inventive concept" may arise in one or more of the individual claim limitations or in the ordered combination of the limitations. *Id.*

This Court has held "[t]he inventive concept inquiry requires more than recognizing that each claim element, by itself, was known in the art," and "an inventive concept can be found in the non-conventional and non-generic arrangement of known, conventional pieces." *Bascom*, No. 2015-1763, slip op. at *15. At this procedural posture, the claims must be construed in favor of the patentee. *Bascom*, No. 2015-1763, slip op. at *19.

Under 35 U.S.C. § 282, the patents-in-suit "shall be presumed valid. Each claim of a patent (whether in independent, dependent, or multiple dependent form) shall be presumed valid independently of the validity of other claims; dependent or multiple dependent claims shall be presumed valid even though dependent upon an invalid claim. The burden of establishing invalidity of a patent or any claim thereof shall rest on the party asserting such invalidity."

## C. The district court incorrectly found the claims of the patents to be patent-ineligible.

### *1. At step one, the claims of the patents are directed to patent-eligible subject matter.*

At step one, the Court must first "determine whether the claims at issue are directed to a patent-ineligible concept." *Alice*, 134 S. Ct. at 2355. As there is still no established definitive rule to determine what constitutes an "abstract idea" sufficient to satisfy step one, *Id.* at 2357, this Court and the Supreme Court have found it sufficient to compare claims at issue to those claims already found to be directed to an abstract idea in previous cases. *Enfish,* 822 F.3d at 1334.

Open Parking's patents undeniably describe and claim systems for communication of real-time parking lot occupancy information. Recently, in *Electric Power Group*, No. 2015-1778, slip op. at *2, this Court found patents that described and claimed "systems and methods for performing real-time performance monitoring of an electric power grid by collecting data from multiple data sources, analyzing the data, and displaying the results" to be directed to the abstract idea of "collection, analysis, and display of available information in a particular field."

It is noted that the claims in *Electric Power Group* have a priority date almost four years later than Open Parking's claims. More importantly, Open Parking's system claims are substantively and significantly different from the method claims found to be directed to an abstract idea in *Electric Power Group*.

Open Parking's claims do not recite collecting or gathering information in an abstract context or any mental steps people go through in their minds, but require a wireless communications device capable of accessing the Internet and a software application for receiving parking data transmitted over the Internet to the wireless communications device, which are concrete technical elements and distinguishing features over the prior art as well as purely human ways of communicating information.

Open Parking's claims do not recite presenting information in an abstract context or in any human way (with or without pencil and paper), but rather require a wireless communications device having Internet and display capabilities and a particular software tool for visually rendering a substantially real-time representation of an available parking lot indicating an occupancy condition that changes according to vacant parking spaces, which are all concrete technical elements and

distinguishing features over the prior art as well as any purely human ways of presenting information.

Open Parking's claims do not recite intangible information as such, but rather parking data transmitted over the Internet to a wireless communications device and capable of being rendered by the wireless communications device as substantially real-time representation of an available parking lot indicating its changing occupancy condition.

If the concrete limitations of Open Parking's system claims are properly considered as ordered combinations without ignoring the requirements of the individual specific claimed features that allow for the improvement realized by the invention, *McRO*, 2015-1080, slip op. at *21, and are not stripped away so that something that can be characterized as an abstract idea can be revealed, the claims are clearly "directed to" concrete technical tools and improvements.

When the technical elements and requirements of claim 1 of the '786 patent are fully considered and construed, the claimed invention is the ordered combination of a parking system comprising: a wireless communications device capable of accessing the Internet (in essence, a wireless PDA and/or wireless mobile telephone capable of accessing the

Internet or other handheld wireless device capable of communications including Internet access); and a software program designed for receiving parking data transmitted over the Internet to said wireless communications device (in essence, a parking system mobile app), wherein the parking data can be rendered by the wireless communications device as a substantially real-time representation indicating an occupancy condition of an available parking lot (how much occupancy the available parking lot has), and the occupancy condition (indicated in the substantially real-time representation) changes according to presence of vacant parking spaces within the available parking lot and changes according to absence of vacant parking spaces within the available parking lot. Appx37.

When the technical elements and requirements of claim 1 of the '391 patent are fully considered and construed, the claimed invention is the ordered combination of a parking system comprising: a server that is accessible over the Internet by a subscriber using a wireless communications device; and a software application that instructs the server to transmit parking data over the Internet to the wireless communications device of the subscriber, wherein the parking data can

be rendered by the subscriber using the wireless communications device as a substantially real-time representation indicating of an occupancy condition of an available parking lot (how much occupancy the available parking lot has), wherein the occupancy condition (indicated in the substantially real-time representation) changes according to presence of vacant parking spaces within the available parking lot and changes according to absence of vacant parking spaces within the available parking lot. Appx49.

When the requirements of the recited limitations are not ignored, the claims are clearly directed to ordered combinations of technical elements (specific hardware, parking system software, technical processing, and technical parking data received over the Internet and applied in the technical processing) which allow for the improvement realized by the invention and which are not abstract. The claims recite significant and meaningful limitations that differentiate the technical nature of the claims from mental and/or pencil and paper processes. Furthermore, the claims require specific machines (a wireless communications device capable of accessing the Internet and/or a server accessible over the Internet by wireless communications devices) as well

as the transformation of parking data into a substantially real-time visual representation of an available parking lot indicating its real time changing occupancy condition, thus satisfying the machine or transformation test.

When understood in light of their specific limitations, the claims are unambiguously directed to improvements in computer capabilities. The claims include specific and inventive combinations of technical elements that unambiguously improve and import new computer functionality into a parking system and its network infrastructure components and improve the technical process of communicating real-time parking information to remote commuters.

The character of Open Parking's claims as a whole is clearly focused on technological improvements. Specifically, the claims are directed to improvements to the networking infrastructure components of a parking system and a better way for remote commuters to receive real-time parking information. But, by improperly ignoring the technical features of the claims, the district court found the claims to be abstract by theorizing that:

> However, the "occupancy condition" of a parking lot, *i.e.* data about whether there are any open spots, could be rendered by

> humans using a pen and paper. Perhaps there is an attendant at the gate who looks around the lot and writes the number of open spaces on a chalkboard for passersby to see. Or there could be a simple "vacancy/no vacancy" sign outside of a lot, or a "real time" electronic sign showing the then-existing number of open spaces, based on the entry/exit of cars. These examples are means to the same end: transmitting to commuters whether there are any open spots in a parking lot, via a graphical display and in substantially real time.
>
> Appx14.

Nevertheless, the district court acknowledged the technical nature of the invention and improvements over current parking systems stating:

> I'm sure it can be found in many places, but as you go in each garage [at Pentagon City today], there is a digital sign that says Zone A, 57 spots; Zone B, 219 spots; Zone C -- so we already can capture it outside the garage, that's already going on. This communicates it to me when I'm eight miles down the road, right?
>
> Appx238.

And, the district court properly acknowledged that:

> The '391 and '786 patents are essentially directed to letting commuters like [the] Inventor know whether there are any open parking spaces before they arrive at a lot. Appx3; and
>
> There exists a meaningful limitation in the representative claim: the rendering of the parking lot occupancy is "substantially real time." Therefore, the function could not be performed by a parking lot attendant handing out maps. Appx14.

Essentially, the district court found the invention to be a particular concrete technical solution for solving a technical problem in a way that improves over prior art and current parking systems and also found that claims reciting the real-time representation being a map are not directed to an abstract idea at all. However, by choosing to analyze a single claim, the district court never considered claims 7, 8, and 15-20 of the '391 patent and claims 7-10, 19, 20, 39-46, and 59-71 of the '786 patent, which positively recite a real-time representation comprising a map.

For instance, among its elements, claim 70 of the '786 patent requires a software application that instructs a server to transmit parking data over the Internet to a portable wireless communications display device implemented as a mobile telephone for rendering the parking data on the device as a substantially real-time representation comprising a map displaying a location for each of a plurality of parking lots and indicating an occupancy condition for one or more of the parking lots that changes according to presence and absence of vacant parking spaces within the one or more parking lots. Appx39.

The claims of patents are in fact directed to improvements in parking system network infrastructure components composed of

inventive technical elements and inventive combinations of technical elements that improve over conventional parking system, computer, and network technology and implement a more accessible, available, dynamic, and efficient technical means for solving the objectively technical problem of communicating real-time parking lot occupancy information to remote commuters in advance of their arrival at a physical parking lot.

It is evident that the patents are directed to improvements in parking system technology and, unlike the parking systems that existed at the time, the claimed parking system communicates the real-time changing occupancy condition of a parking lot over the Internet to remote commuters, which was not known in the prior art. Nevertheless, the district court asserted that "these patents are directed to a longstanding method of organizing human activity" since:

> Information about open parking spaces has long been broadcast to drivers who cannot actually see the open spaces. For example, in many major cities, parking garages in which spots are shielded from view have displays on the outside indicating if (and in some cases how many) spots are vacant. And a drive through the streets outside PNC Park on the evening of a Pirates game reveals any number of people with orange flags waving to cars to indicate there are vacant spots in their lots. Presumably, those flag wavers stop waving when the lots are full, further corroborating the "substantially real-time" nature of their data transmission.

Appx15.

The existence of current parking systems such as the one at Pentagon City, which was installed in 2014 and referenced during oral arguments, and flag wavers at PNC Park, which opened in 2001, is inapposite evidence. More importantly, none of these "non-Internet" analogs solve the objectively technical problem of communicating real-time parking lot occupancy information to remote commuters in advance of their arrival at a physical parking lot. In short, the district court's examples do not provide any comparable solution to the particular concrete technological solution claimed in the patents.

The claims are unambiguously directed to improvements in parking system network infrastructure components, computerized parking systems, and technical processes and therefore pass step one of the *Alice* patent-eligibility framework.

***2. At step two, the claims of the patents recite inventive concepts and therefore are patent-eligible.***

While "abstract ideas" are excluded from § 101, an abstract idea can be transformed into patent-eligible subject matter by an "inventive concept" which is "an element or combination of elements that is 'sufficient to ensure that the patent in practice amounts to significantly

more than a patent upon the [ineligible concept] itself.'" *Alice*, 134 S. Ct. at 2355. (modification in original). In evaluating whether there is an "inventive concept" in a claim, courts must "consider the elements of each claim both individually and 'as an ordered combination' to determine whether the additional elements 'transform the nature of the claim' into a patent-eligible application." *Id.* at 2358.

Although determining "whether a claim is drawn to patent-eligible subject matter under § 101 is an issue of law," *In re Bilski,* 545 F.3d 943, 951 (Fed. Cir. 2008), *aff'd sub nom. Bilski* v. *Kappos,* 130 S. Ct. 3218 (2010), a § 101 determination (like a § 103 determination) is based on underlying factual inquiries. This Court has considered what the applicant considered the invention to be at the time over the background prior art mentioned in the patent as a relevant factual inquiry underlying § 101 eligibility. *See e.g.*, *Enfish*, 822 F.3d at 1330; *TLI*, 823 F.3d at 612-14; *Bascom*, No. 2015-1763, slip op. at *3-6.

The '786 patent summarizes the invention as:

> A parking system includes a wireless communications device capable of accessing a server over the Internet and a software application for receiving parking data transmitted over the Internet to the wireless communications device. The wireless communications device can render the parking data as a substantially real-time representation indicating an

> occupancy condition of an available parking lot. The occupancy condition changes according to presence and absence of vacant parking spaces within the available parking lot.

Appx35.

It is also standard for a § 101 inquiry to consider whether various claim elements recite "well-understood, routine, conventional activities." *Bascom*, No. 2015-1763, slip op. at *15 (citing *Alice*, 134 S. Ct. at 2359).

Even though this Court has held that "[t]he inventive concept inquiry requires more than recognizing that each claim element, by itself, was known in the art," *Id.* at *15, the district court did not even do the minimum of considering whether or not each individual claim element was known in the art and simply concluded that "the '391 and '786 Patents describe the shuffling of one type of data over the Internet and with generic computer technology." Appx20. The district court's assertion that "[l]imiting the application of these claims to mobile devices capable of accessing the Internet is really just limiting them to one selected form of generic computer technology," Appx19, is unsupported by any factual evidence and completely conclusory.

Each claim in the '391 patent and the '786 patent is clearly a statutory category of invention, useful, enabled, and novel. The district

court's analysis, however, was akin to a § 103 obviousness analysis but without having to establish that the claimed limitations were known in the art at the time of the invention and without having to explain why it would have been obvious to combine the limitations as claimed. Such expedient analysis is improper. *Bascom*, No. 2015-1763, slip op. at *15.

There is no factual evidence on the record that wireless communications devices capable of accessing the Internet or servers accessible over the Internet by such wireless communications devices were known, let alone so ubiquitous, conventional or generic at the time of the invention as to obviate the need to furnish any evidence of their prior existence and capabilities or conduct any further § 102 or § 103 analysis.

There is no factual evidence on the record that software applications that instruct a server to transmit, over the Internet to a wireless communications device, data that can be rendered by the wireless communications device as a substantially real-time representation indicating a changing condition of a remote resource were known, let alone so ubiquitous, conventional or generic at the time of the

invention as to obviate the need to furnish any evidence of their prior existence and capabilities or conduct any further § 102 or § 103 analysis.

There is no factual evidence on the record that software applications for receiving data transmitted over the Internet to a wireless communications device (mobile apps) and rendering such data by the wireless communications device as a substantially real-time representation (including as a real-time map) indicating a changing condition of a remote resource were known, let alone so ubiquitous, conventional or generic at the time of the invention as to obviate the need to furnish any evidence of their prior existence and capabilities or conduct any further § 102 or § 103 analysis.

The claims do not claim the idea of communicating real-time parking lot occupancy information on the Internet using a set of generic computer components. Rather, the claims recite a particular concrete technical solution entirely rooted in computer technology to solve the objectively technical problem of communicating real-time parking lot occupancy information to remote commuters in advance of their arrival at a physical parking lot and that is implemented with a non-generic and

non-conventional arrangement of non-generic and non-conventional technical elements in a non-generic and non-conventional way.

The district court's characterization of all of the claims as merely "shuffling of one type of data over the Internet and with generic computer technology" drastically oversimplifies and views the invention in hindsight in light of current technology rather than the prior art.

When the claim elements are scrutinized "more microscopically" to examine precisely what they add, *Electric Power Group*, No. 2015-1778, slip op. at *8, construed in favor of Open Parking, *Bascom*, No. 2015-1763, slip op. at *19, and considered both individually and as an ordered combination, *Alice*, 134 S. Ct. at 2355, it is clear that claims recite an inventive concept sufficient to pass step two of *Alice*.

The inventive concept included in the claims is the non-generic and non-conventional arrangement of non-generic and non-conventional parking system software tools implemented on non-generic and non-conventional parking system infrastructure components to improve the parking system, its infrastructure components, and the technical process of communicating real-time parking lot occupancy information to remote commuters in advance of their arrival at a physical parking lot.

Regarding the inventive front-end parking system infrastructure components that interface with a remote commuter, claim 1 of the ’786 patent recites the inventive combination of a parking system comprising: a wireless communications device capable of accessing the Internet (in essence, a wireless PDA and/or wireless mobile telephone capable of accessing the Internet or other handheld wireless device capable of communications including Internet access); and a software program designed for receiving parking data transmitted over the Internet to said wireless communications device (in essence, a new parking system mobile app), wherein the parking data can be rendered by the wireless communications device as a substantially real-time representation indicating of an occupancy condition of an available parking lot (how much occupancy the available parking lot has), wherein the occupancy condition (indicated in the substantially real-time representation) changes according to presence of vacant parking spaces within the available parking lot and changes according to absence of vacant parking spaces within the available parking lot. Appx37.

Open Parking’s claims in the ’786 patent also include inventive combinations that recite the above and further wherein: the wireless

communications device is a vehicle-mounted device (claim 2) or a portable device (claim 3) such as a mobile telephone (claim 13) or a personal digital assistant (claim 14); the available parking lot is in geographic proximity to the wireless communications device (claim 4) or in geographic proximity to a travel destination (claim 5); the parking data corresponds to a plurality of parking lots (claim 6); the substantially real-time representation comprises a map (claim 7) and a location of at least one available parking lot having an occupancy condition corresponding to at least one vacant parking space being present within the available parking lot (claim 8) or a location of at least one available parking space within an available parking lot having an occupancy condition corresponding to at least one vacant parking space being present within the available parking lot (claim 9); a map representing a plurality of parking lots (claim 10); the substantially real-time representation indicates the number of vacant spaces present within the available parking lot (claim 11) or reserved parking spaces (claim 12). Appx37.

Regarding the new back-end parking system infrastructure components of the data access layer, claim 1 of the ’391 patent recites the inventive combination of a parking system comprising: a server that is

accessible over the Internet by a subscriber using a wireless communications device; and a software application that instructs the server to transmit parking data over the Internet to the wireless communications device of the subscriber (in essence, a new parking system server application), wherein the parking data can be rendered by the subscriber using the wireless communications device as a substantially real-time representation of an available parking lot indicating its occupancy condition (how much occupancy the available parking lot has) which changes according to presence and absence of vacant parking spaces within the available parking lot. Appx49.

Open Parking's claims in the '391 patent also include inventive combinations that recite the above and further wherein: the available parking lot is a reserved parking lot for which the subscriber has a reservation (claim 3), is in geographic proximity to the subscriber (claim 4) or is in geographic proximity to a travel destination (claim 5); the real-time representation comprises a map identifying a location of at least one available parking lot having an occupancy condition corresponding to at least one vacant parking space being present within the available parking lot (claim 7), a map identifying a location of at least one available

parking space within an available parking lot having an occupancy condition corresponding to at least one vacant parking space being present within the available parking lot (claim 8), a Web page (claim 9), or number of vacant parking spaces present within the available parking lot (claim 10); or the wireless communications device is a vehicle-mounted device (claim 11) or a hand-held device (claim 12). Appx49.

Furthermore, claim 70 of the '786 patent includes the inventive combination of a parking system comprising: a server that is accessible over the Internet by a portable wireless communications display device implemented as a mobile telephone; and software application that instructs the server to transmit parking data over the Internet to the portable wireless communications display device implemented as a mobile telephone for rendering the parking data on the device as a substantially real-time representation comprising a map displaying a location for each of a plurality of parking lots and indicating an occupancy condition for one or more of the parking lots that changes according to presence and absence of vacant parking spaces within the one or more parking lots. Appx39.

This Court's recent case law regarding *Alice* step two establishes the patent-eligibility of the claims. The district court's opinion relied heavily on *TLI*, *See* Appx10-11, Appx16-19, and gave short shrift to *Enfish* and *Bascom*, which was handed down by this Court only two days before the district court's opinion and was not given thorough consideration by the district court. *See* Appx10-13, Appx15-17.

In *Alice*, the problem was how to facilitate the exchange of financial obligations between two parties using a computer system as a third-party intermediary, which was found not to be a technical problem since no new technology was necessary and nearly every computer included generic components capable of performing the basic calculation, storage, and transmission functions required by the claims.

In *DDR*, the problem was how to avoid websites instantly losing views upon the click of a link, which was found to be a technical problem that was solved by the invention of a particular technical way of producing a composite web page.

In *Enfish*, the problem was how to provide a logical model for a computer database, which was a technical problem solved by the

invention of a particular technical database technique that improved computer capabilities.

In *TLI*, the problem was how to provide recording, administration and archiving of digital images simply, fast and in a way that the information may be easily tracked, which was found not to be a technical problem since no new technology was necessary for a generic server to perform the conventional functions of storing, receiving, and extracting data required by the claims.

In *Bascom*, the problem was how to provide individually customized Internet-content filtering while avoiding the need for local servers or computers to perform such filtering and while being less susceptible to circumvention by the user, which was found to be a technical problem that was solved by the invention of a particular technical filtering tool at a specific location, remote from the end-users, with customizable filtering features specific to each end user.

In *Electric Power Group*, the problem to be solved was how to monitor and analyze data from multiple distinct parts of a power grid, which was found not to be a technical problem since no new technology was required for off-the-shelf, conventional computer, network, and

display technology to perform the functions of gathering, sending, and presenting desired information required by the claims.

In this case, solving the objectively technical problem of communicating real-time parking lot occupancy information to remote commuters in advance of their arrival at a physical parking lot required new technology, and the claimed invention is a new technical means for solving the objectively technical problem. The claimed invention represents a new software-based invention that was unavailable at the time of the invention and that improves computerized parking systems and improves the technical process of communicating real-time parking lot occupancy information to remote commuters in advance of their arrival at a physical parking lot.

The claims enumerate new technological information sources, new types of technical parking data, and new technical processes that were previously unavailable within a conventional parking system.

Essentially, the combination of technical elements in the claims recites a parking system comprising a wireless Internet communications device (e.g., Internet-enabled mobile telephone phone and/or PDA) and a parking system mobile software application which, as a whole, is a new

technological source of parking information for users. The real-time representation indicating the changing occupancy condition of the available parking lot is also a new technological source of parking information for users. And, the parking system mobile software application itself is a new technological source of technical parking data for the wireless Internet communications device. Further, the technical parking data capable of being rendered by the wireless communications device as a substantially real-time representation indicating a changing occupancy condition of an available parking lot is a new type of data. As a whole, the claims require an inventive set of components that generates new data in the form of a substantially real-time representation of an available parking lot indicating its changing occupancy condition that is rendered by a wireless communications device.

At the time, a parking system mobile software application was clearly inventive. The claimed parking system software application for the wireless communications device was a new lightweight software tool designed for the purpose of receiving parking data transmitted over the Internet and requiring less computing resources than the Navigator or

Internet Explorer browser applications which were not designed for wireless communications devices at the time of the invention.

Open Parking's particular implementation of communicating real-time parking lot occupancy information to remote commuters was not conventional or generic at the time of the invention. The claims technically improve operation of parking systems and provide new communication functionality for allowing remote commuters to receive real-time parking information in advance of their arrival at a physical parking lot. The claims improve the technical process of communicating real-time parking lot occupancy information to remote commuters by way of a new parking system mobile app that receives parking data transmitted over the Internet to a wireless communications device for rendering on the wireless communications device as a substantially real-time representation indicating the changing occupancy condition of an available parking lot.

The claims also achieve technical improvements in other technological areas by reducing driving time, conserving vehicle fuel, easing traffic congestion, and benefiting the environment.

The claims do not merely recite communicating real-time parking information on the Internet or on a set of generic computer components. Rather, the claims recite a specific, discrete, and particular concrete way of receiving real-time parking information that is a technical improvement over prior art parking systems.

The claims do not attempt to preempt all ways of using the Internet to solve the objectively technical problem of communicating real-time parking lot occupancy information to remote commuters in advance of their arrival at a physical parking lot. The claims do not claim the concept of communicating real-time parking lot occupancy information itself, but rather claim a particular concrete technical solution and a specific and better way of solving the objectively technical problem that does not attempt to monopolize every potential solution to the problem in general.

Regarding preemption, the claims do not attempt to monopolize all ways of using the Internet or wireless communications devices to communicate real-time status information or to solve the technical problem of communicating real-time parking lot occupancy information to remote commuters in advance of their arrival at a physical parking lot.

The claims do not improperly tie up the future use of any building block of human ingenuity.

The district court clearly erred in finding the claims not to be patent-eligible under 35 U.S.C. § 101 when applying the two-step *Alice* patent-eligibility test. Nothing on the record justifies dismissal under Rule 12(b)(6).

## IX. CONCLUSION AND STATEMENT OF RELIEF SOUGHT

For the foregoing reasons, the judgment of the district court should be reversed and the case remanded for trial.

Dated: September 19, 2016

Respectfully submitted,

Stanley M. Stein
STANLEY M. STEIN, P.C.
445 Ft. Pitt Blvd.
Suite 150
Pittsburgh, PA 15219
412-904-4573

By *<u>/s/ Stanley M. Stein</u>*
Stanley M. Stein

*Attorney for Plaintiff-Appellant*

# ADDENDUM

## ADDENDUM TABLE OF CONTENTS


| DOCUMENT | PAGE NO. |
|---|---|
| ECF No. 42, Judgment, June 30, 2016 | Appx1 |
| ECF No. 41, Opinion, June 30, 2016 | Appx2-Appx20 |
| U.S. Patent No. 6,750,786 | Appx27-Appx39 |
| U.S. Patent No. 6,501,391 | Appx40-Appx50 |

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| OPEN PARKING, LLC,<br>Plaintiff,<br><br>v.<br><br>PARKME, INC.,<br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>) | Civil Action No. 2:15-cv-976<br><br>Judge Mark R. Hornak |

**ORDER**

AND NOW, this 30th day of June, 2016, after oral argument on the pending Motion then before the Court, heard on March 8, 2016, and upon consideration of the filings submitted to the Court, the record adduced, and the arguments presented, it is hereby ORDERED that Defendant ParkMe, Inc.'s Motion to Dismiss [ECF No. 9] is GRANTED with prejudice for the reasons set forth in the Court's Opinion of this date.

There being no additional claims pending before this Court, the Clerk is hereby directed to mark this case "Closed."

Mark R. Hornak
United States District Judge

cc: All counsel of record

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| OPEN PARKING, LLC,<br>Plaintiff, | )<br>) | |
| | ) | Civil Action No. 2:15-cv-976 |
| v. | ) | |
| | ) | Judge Mark R. Hornak |
| PARKME, INC.,<br>Defendant. | )<br>) | |

**<u>OPINION</u>**

**Mark R. Hornak, United States District Judge**

Open Parking, LLC filed this lawsuit to vindicate what it says is the harm resulting from the unlawful infringement of two patented "mobile and/or web-based smart parking applications." *See* ECF No. 8, at 3–4 ¶¶ 12, 18. The alleged infringer, ParkMe, Inc., moved to dismiss the Amended Complaint arguing that the patents at issue are directed to ineligible subject matter under 35 U.S.C. § 101. ECF No. 9. The parties fully briefed the issues and the Court heard oral argument on March 8, 2016. ECF Nos. 10, 28, 30, 32, 38, 39.

For the reasons that follow the Court concludes that Open Parking's patents are indeed directed to ineligible subject matter under § 101. Therefore, ParkMe's Motion to Dismiss will be granted.

## I. <u>BACKGROUND</u>

Inventor Robert Racunas, Jr. faced a dilemma. Each weekday morning he drove from his home in Northern Virginia to the Vienna Metro Station and each weekday morning he found himself in the precarious position of circling a nearly-full parking lot. *See* ECF No. 28, at 8. On particularly bad days, he was forced to park in an adjacent lot and take a shuttle to the Metro. *Id.* at 9. Occasionally, in a cruel twist of fate, Inventor Racunas would see open parking spaces in

the Metro lot *after* he had parked elsewhere and shuttled in. *Id.* There being no app for navigating this rat race, Inventor Racunas took matters into his own hands.

He eventually filed for and was granted two patents: United States Patent Nos. 6,501,391 ("'391 Patent") and 6,750,786 ("'786 Patent"). ECF No. 8-1. As Open Parking would have it, the "inventive concept" of the patents is as follows:

> A portable wireless remote graphical display device structured and arranged to access the Internet from home, office, vehicle, or any other location comprising a specific software application on the portable wireless remote graphical display device for commanding a server at a parking lot or remote location to transmit parking lot occupancy data corresponding to one or more parking lots over the Internet to the portable wireless remote graphical display device and for receiving and displaying the parking lot occupancy data on the portable wireless remote graphical display device as a real-time representation of the parking lot indicating vacant parking spaces within the parking lot.

ECF No. 28, at 9.

The '391 and '786 patents are essentially directed to letting commuters like Inventor Racunas know whether there are any open parking spaces before they arrive at a lot. To do that, the patents describe a system that uses parking space detectors (like position, motion, and weight detectors, video cameras, and the like) equipped with communication devices to send signals over the Internet that are received by a portable device, presumably operated by a driver. Displayed on that device would be something that indicates to the driver whether there are any open parking spaces in the lot, or not.

In late 2015, Open Parking filed this patent infringement suit against ParkMe, Inc. alleging that ParkMe infringed both the '391 and '786 patents by dealing in "hardware and/or software implementing Defendant's mobile and/or web-based smart parking applications." ECF

No. 8, at 3–4 ¶¶ 12, 18. ParkMe in turn moved to dismiss the Amended Complaint, arguing that the patents are invalid under 35 U.S.C. § 101. ECF No. 9.

For the purposes of this Motion, the Court will examine what the parties have designated as the representative claim. *See* ECF No. 28, at 9; ECF No. 30, at 7. That claim is Claim One of the ’786 Patent and reads as follows:

> A parking system comprising:
> a wireless communications device capable of accessing the Internet; and
> a software application for receiving parking data transmitted over the Internet to the wireless communications device, wherein
> the parking data can be rendered by the wireless communications device as a substantially real-time representation indicating an occupancy condition of an available parking lot, and
> the occupancy condition changes according to presence and absence of vacant parking spaces within the available parking lot.

’786 Patent col. 6 ll. 18–31.[1]

## II. LEGAL STANDARD

Federal courts must dismiss cases that fail to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). Complaints therefore must allege facts “sufficient to show that the plaintiff has a ‘plausible claim for relief.’” *Fowler v. UPMC Shadyside*, 578 F.3d 203, 211 (3d Cir. 2009) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009)).

Thus, in a patent infringement case, patent eligibility takes center stage. If the patent that was allegedly infringed is invalid because it is directed to patent-ineligible subject matter, the

[1] In its Supplemental Brief, Open Parking “does not imply and explicitly does not concede that all claims fall together” even though it stipulated to the representative claim. ECF No. 38, at 6. For the purposes of assessing a § 101 challenge however, courts routinely address one representative claim and this Court will do so here. *See, e.g.*, *Alice Corp. Pty. Ltd. v. CLS Bank Int’l et al.*, 134 S. Ct. 2347, 2359–60 (2014) (finding 208 claims to be patent-ineligible based on analysis of one claim); *Mortgage Grader, Inc. v. First Choice Loan Servs., Inc.*, 811 F.3d 1314, 1324 n.6 (Fed. Cir. 2016) (taking up a § 101 challenge but not examining all claims); *Intellectual Ventures I, LLC v. Erie Indem. Co. et al.*, 134 F. Supp. 3d 877, 907–08 (W.D. Pa. 2015) (collecting cases to support analyzing only representative claims in this context).

complaint does not state a claim upon which relief can be granted. The 12(b)(6) stage, then, is the proper one at which to address § 101 patent eligibility challenges. *See Intellectual Ventures I, LLC v. Erie Indem. Co. et al.*, 134 F. Supp. 3d 877 (W.D. Pa. 2015) (resolving patent eligibility on a motion to dismiss).

## III. DISCUSSION

Section 101 patent eligibility challenges are resolved using the framework set out by the Supreme Court in *Alice Corp. Pty. Ltd. v. CLS Bank Int'l et al.*, 134 S. Ct. 2347 (2014). Open Parking has raised the issue of claim construction, which the Court will take up first before analyzing both parts of the *Alice* test.

### a. Claim Construction

"The general rule is . . . that terms in the claim are to be given their ordinary and accustomed meaning." *Johnson Worldwide Assocs. v. Zebco Corp.*, 175 F.3d 985, 989 (Fed. Cir. 1999). And "the ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, *i.e.*, as of the effective filing date of the patent application." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005) (en banc).

Open Parking proposes the following constructions:

| **Representative Claim** | **Construction** |
|---|---|
| 1. A parking system comprising: | *A parking system comprising:* |
| a wireless communications device capable of accessing the Internet; and | *a wireless PDA and/or wireless mobile telephone capable of accessing the Internet or other handheld wireless device capable of communications including Internet access; and* |
| a software application for receiving parking data transmitted over the Internet to the wireless communications device, wherein | *a software program designed for receiving parking data transmitted over the Internet to the wireless PDA and/or wireless mobile telephone capable of accessing the Internet or other handheld wireless device capable of* |

| | |
|---|---|
| | *communications including Internet access, wherein* |
| the parking data can be rendered by the wireless communications device as a substantially real-time representation indicating an occupancy condition of an available parking lot, and | *the parking data can be processed by the wireless PDA and/or wireless mobile telephone capable [of] accessing the Internet or other handheld wireless device capable of communications including Internet access to visually display a substantially real-time representation of an available parking lot indicating a status of how much occupancy or vacancy the available parking lot has, and* |
| the occupancy condition changes according to presence and absence of vacant parking spaces within the available parking lot. | *the status of how much occupancy or vacancy the available parking lot has indicated in the substantially real-time representation changes according to presence of vacant parking spaces within the available parking lot and changes according to absence of vacant parking spaces within the available parking lot.* |

ECF No. 38, at 6–7. These constructions bear some resemblance to the constructions offered in Open Parking's Brief in Opposition to the Motion to Dismiss. *See* ECF No. 28, at 17–18. They are, however, different. Because they are the latest and seemingly optimal constructions Open Parking has to offer, the Court will assume it means it, and proceed with consideration of the constructions from the Supplemental Brief.[2]

Whether or not to actually construe the claims at all, however, is a horse of a different color. Open Parking does not dispute, because it cannot, that this Court can decide § 101 eligibility at this stage without formal claim construction. ECF No. 28, at 14; *see also Bancorp Servs. LLC v. Sun Life Assur. Co. of Canada (U.S.)*, 687 F.3d 1266, 1273 (Fed. Cir. 2012)

[2] Open Parking's Supplemental Brief is largely a broadside against the Supreme Court's decision in *Alice*. And though this Court is vested with substantial powers, sidestepping Supreme Court decisions is not among them. For Open Parking, the unfortunate effect of that decision is to invalidate many software patents, but arguing that because the software is executed on physical devices does not transmute a patent-ineligible idea into a patent-eligible one. Computers are obviously integral to the functionality of software, indeed software is worthless without a device on which it can be executed. But this is not a case involving a shovel with a new blade, rather it involves software. *See* ECF No. 38, at 10 n.20. The Supreme Court has instructed us that software patents must be held to the stringent *Alice* requirements in a § 101 challenge.

("claim construction is not an inviolable prerequisite to a validity determination under § 101"); *Intellectual Ventures I*, 134 F. Supp. 3d at 908 ("claim construction is desirable, unless in reviewing the patents at issue, a district court concludes that it isn't."). Instead, Open Parking marshals all sorts of arguments about why claim construction is, in its view, both desirable and necessary here. *See, e.g.*, ECF No. 28, at 14–18; ECF No. 38, at 4–7. None of the arguments are availing.

First, the law remains that the terms in patent claims are generally given their ordinary and accustomed meanings. *See Johnson Worldwide Assocs.*, 175 F.3d at 989; *Renishaw PLC v. Marposs Societá Per Azioni*, 158 F.3d 1243 (Fed. Cir. 1998). And it is not particularly exceptional when "the ordinary meaning of claim language . . . [is] readily apparent even to lay judges." *Phillips*, 415 F.3d at 1312–13 (en banc). In those cases, claim construction is not really "construction" at all, but "little more than the application of the widely accepted meaning of commonly understood words." *Id.* at 1314; *see also Brown v. 3M*, 265 F.3d 1349, 1352 (Fed. Cir. 2001) (holding that the claims did "not require elaborate interpretation"). Indeed, the Federal Circuit "has repeatedly held that a district court is not obligated to construe terms with ordinary meanings." *O2 Micro Intern. Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1360 (Fed. Cir. 2008).

Second, it appears to the Court that Open Parking's "constructions" are really just attempts to rewrite (and narrow) the actual claims. Open Parking couches its proposed "constructions" as those most favorable to it or those that contextualize the claim language such that they demonstrate how a person of ordinary skill in the art would have understood it when the patents were filed in 1999. ECF No. 38, at 4–5 (citing *Phillips*, 415 F.3d at 1313).[3] The revised

[3] Open Parking also argues that because "there is no expert testimony or extrinsic evidence from 1999 to help answer factual and claim construction issues" and because it says "it is unclear whether § 101 is factual and/or

proposed constructions in Open Parking's Supplemental Brief rely heavily on what Open Parking represents to be dictionary definitions from a Microsoft Computer Dictionary, Fourth Edition from May 1999 and a Microsoft Computer Dictionary, Fifth Edition from March 2002. ECF No. 38, at 5 n.3. Open Parking says this is appropriate because they supposedly contain contemporaneous meanings of the words used in the claims and thus lead to the ordinary and customary meanings of the terms. *Id.* at 6. The only authority cited for this proposition is the Federal Circuit's decision in *Ariosa Diagnostics, Inc. v. Sequenom, Inc.*, 788 F.3d 1371 (Fed. Cir. 2015), and even that is buried in a footnote. Open Parking is correct in that the Federal Circuit in *Ariosa* focused its inquiry on what was known in 1997 when that patent was filed. *See Ariosa Diagnostics*, 788 F.3d at 1377. But the Federal Circuit held that "appending routine, conventional steps to a natural phenomenon, specified at a high level of generality, is not enough to supply an inventive concept," at the equivalent of *Alice* step two. *Id.* at 1378. It further noted that the "routine, conventional steps" were already well-known when the patent was filed. So *Ariosa* does not stand for the broad proposition that patent language is to be construed only with respect to the technologies existing at the time the patent was filed. The patents here use terms like "general purpose computer," '391 Patent col. 3 ll. 60–67, and given how it now seeks to refine and narrow the patents via "construction," there can be little doubt that Open Parking would file an infringement action if its product were used on an iPad, iPhone, Apple Watch, or some other device manufactured after 1997. Thus, the Court need not cabin its understanding of the claim language to an understanding of technology that existed in 1997.

---

legal," the Court should engage in formal claim construction before proceeding to the *Alice* analysis. ECF No. 38, at 4–5. Unfortunately for Open Parking, however, the law is clear. "Whether a claim is drawn to patent-eligible subject matter under § 101 is an issue of law." *In re Bilski*, 545 F.3d 943, 951 (Fed. Cir. 2008), *aff'd sub nom. Bilski v. Kappos*, 561 U.S. 593 (2010). Moreover, courts need not necessarily consider expert evidence in a § 101 challenge at the pleadings stage. *See Rothschild Location Techs. LLC v. Geotab USA, Inc.*, No. 6-15-cv-00682, 2016 WL 2847975, at *2–3 (E.D. Tex. May 16, 2016) (citing *Mortgage Grader*, 811 F.3d at 1325).

Finally, the guidance provided by the Federal Circuit makes clear that courts "must presume that the terms in the claim mean what they say, and unless otherwise compelled, give full effect to the ordinary and accustomed meaning of claim terms." *Johnson Worldwide Assocs.*, 175 F.3d at 989 (collecting cases). And "to overcome this heavy presumption in favor of the ordinary meaning of claim language," a patentee must have either (1) "chosen to be his or her own lexicographer by clearly setting forth an explicit definition for a claim term," or (2) chosen terms that "so deprive the claim of clarity that there is no means by which the scope of the claim may be ascertained from the language used." *Id.* at 989–90. "In these two circumstances, a term or terms used in the claim invites—or indeed, requires—reference to intrinsic, or in some cases, extrinsic, evidence." *Id.* at 990. No such invitation or requirement exists in this case.

The '391 and '786 patents themselves belie any ambiguity in the terms that would require formal claim construction. They define a "remote display device" as "any type of computer, computer system, server, settop box or other type of Internet accessible device." *See* '391 Patent col. 3 ll. 36–38. They further use terms like "general purpose computer," *see* '391 Patent col. 3 ll. 61–62, and browser applications (like Netscape Navigator and Internet Explorer) that were then well-known. '786 Patent col. 4 ll. 41–43.[4] To the extent the Inventor could be his own lexicographer, there are no explicit definitions of claim terms that compel Open Parking's proposed constructions, and the claim language itself is certainly not so lacking in clarity such that there is no means by which the scope of the claim may be ascertained.

At bottom, the purpose of claim construction is to "determin[e] the meaning and scope of the patent claims asserted to be infringed." *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed. Cir. 1995), *aff'd* 517 U.S. 370 (1996). The Court concludes that the ordinary meaning

[4] These broad references to a wide variety of essentially ubiquitous and generic devices and software also generates the broad preemption concerns identified by the Supreme Court in *Alice*.

and scope of the claims in both Patents is readily apparent so no formal claim construction is necessary. Thus, the Court will give the claim language its full, ordinary and accustomed meaning and proceed with the *Alice* analysis.

**b. *Alice Step 1***

**i. The Law**

The first step in deciding a § 101 eligibility challenge is to determine whether the claims at issue are "directed to a patent-ineligible concept," that is, whether they are directed to a law of nature, natural phenomenon, or abstract idea. *Alice*, 134 S. Ct. at 2355 (citing *Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 132 S. Ct. 1289 (2012)). Abstract ideas may be "preexisting, fundamental truth[s]" (like mathematical equations), "method[s] of organizing human activity," or "longstanding commercial practice[s]" (like intermediated settlement or risk hedging). *Alice*, 134 S. Ct. at 2356. Essentially, the *Alice* step one inquiry boils down to: what are the claims generally trying to achieve? *See Intellectual Ventures I*, 134 F. Supp. 3d at 897–98 (collecting cases). More specifically, as recently clarified by the Federal Circuit, "a relevant inquiry at step one is 'to ask whether the claims are directed to an improvement to computer functionality versus being directed to an abstract idea.'" *TLI Comms. LLC v. AV Automotive, L.L.C.*, 2016 WL 2865693, at *4 (Fed. Cir. May 17, 2016) (quoting *Enfish, LLC v. Microsoft Corp.*, No. 2015-2044, 2016 WL 2756255, at *11 (Fed. Cir. May 12, 2016)). Of course, this Court must be careful not to oversimplify claims because "[a]t some level, 'all inventions . . . embody, use, reflect, rest upon, or apply laws of nature, natural phenomena, or abstract ideas.'" *Alice*, 134 S. Ct. at 2354 (quoting *Mayo*, 132 S. Ct. at 1293).

This step is a challenging one because the "Supreme Court has not established a definitive rule to determine what constitutes an 'abstract idea' sufficient to satisfy the first step of

the *Mayo*/*Alice* inquiry." *Enfish*, 2016 WL 2756255, at *4. Indeed, the Supreme Court and the Federal Circuit instruct that courts should "compare claims at issue to those claims already found to be directed to an abstract idea in previous cases." *Id.*

Section 101 jurisprudence continues to develop rapidly. Here, the Federal Circuit's recent decision in *TLI Communications* is especially instructive. There, the Federal Circuit held that a patent that related "generally to an apparatus for recording of a digital image, communicating the digital image from the recording device to a storage device, and to administering the digital image in the storage device" was directed to "the abstract idea of classifying and storing digital images in an organized manner and fail[ed] to add an inventive concept sufficient to confer patent eligibility." *TLI*, 2016 WL 2865693, at *1–2. The Federal Circuit concluded that the representative claim, on its face, was directed to that abstract idea despite requiring "tangible components such as 'a telephone unit' and a 'server.'" *Id.* at *3. Those physical devices merely "provide[d] a generic environment in which to carry out the abstract idea." *Id.* In other words, the physical components of the claims were just "conduits" for the abstract idea. *Id.* at *4. Likewise, the "server" recited in the specification was described "simply in terms of performing generic computer functions such as storing, receiving, and extracting data." *Id.*

In *Preservation Wellness Techs., Inc. v. Allscripts Healthcare Solutions, et al.*, No. 2:15-cv-1559, 2016 WL 2742379, at *13 (E.D. Tex. May 10, 2016), the Eastern District of Texas held that patents for maintaining medical records using a network were patent-ineligible under § 101 because they were directed to the "clearly abstract idea" of "securely managing medical records and providing patients and physicians with differential access to those records." The patents claimed a system that maintained the medical records on a central computer server, allowing remote access by authorized persons. *Id.* at *3. The system also claimed a "two-way firewall"

feature that allows patients to do some tasks and doctors only to do others. *Id.* at *4. The court held that the concepts embodied in the claims—record access and management and allowing secure and private access to data—have been found to be abstract in other cases. *Id.* at *7 (collecting cases).[5]

Similarly, in *Mobile Telecomms. Techs., LLC v. Blackberry Corp.*, No. 3:12-cv-1652, 2016 WL 2757371, at *3 (N.D. Tex. May 12, 2016), the court held patent-ineligible several claims which it held were directed to the abstract ideas of "sending and storing messages" and "coded communication."[6] And in *eResearchTechnology, Inc. v. CRF, Inc.*, No 15-918, 2016 WL 2643264, *12 (W.D. Pa. May 10, 2016), claims directed to "using an electronic device to obtain clinical trial data that would otherwise be collected by pen-and-paper diary, and analyzing the data to decide whether to prompt action" were patent-ineligible under the *Alice* test. Importantly, the fact that the invention was limited to clinical trials did not prevent the claims from being abstract. *Id.* at *13 (citing *Bilski v. Kappos*, 561 U.S. 593, 610–11 (2010) for the proposition that the ban on patenting abstract ideas cannot be circumvented by limiting them to a particular technological environment).

On the other hand, in *Enfish*, the Federal Circuit found that patents related to a "self-referential" database were not directed to an abstract idea. *Enfish*, 2016 WL 2756255, at *2. Instead, it held that the patents were directed to "an innovative logical model for a computer database . . . [*i.e.*,] a model of data for a computer database explaining how the various elements of information are related to one another." *Id.* at *1. The patents provided a specific

---

[5] The court also held that the patents lacked any "inventive concept" sufficient to withstand the *Alice* step two bar. *Preservation Wellness*, 2016 WL 2742379, at *13.

[6] At *Alice* step two, the court held that the claims "do not solve problems specifically arising in the realm of computer networks, and technology did not create the problems addressed." *Mobile Telecomms.*, 2016 WL 2757371, at *5. As such, the patents lacked any inventive concept.

improvement in the way computers operate—the self-referential table—which the Federal Circuit concluded was not an abstract idea. *Id.* at *5. The improvement went beyond that generic "storing, organizing, and retrieving [of] memory in a logical table" because it was specifically limited to a self-referential table for a computer database. *Id.* at *6. Importantly, the Federal Circuit distinguished between the patentable claims in *Enfish* and others that simply add conventional computer components to well-known business practices or mathematical formulae. *Id.* at *7–8 (collecting cases).

With that context in mind, the Court will turn to the '391 and '786 Patents at *Alice* step one.

**ii. Application to the '391 and '786 Patents**

ParkMe argues that the claims in the '391 and '786 Patents are generally trying to achieve the transmission, reception, and display of data regarding open parking spaces. ECF No. 30, at 8. And according to ParkMe, that amounts to an abstract idea because it is "directed to shuffling data from one place to another," and because it "describes a longstanding practice that could be completed with pencil and paper." *Id.* at 9.

Open Parking counters by reciting its inventive concept, described in Section I above. They also argue that "specific computer devices, specific software, specific computer functionality, and specific computer implementation, which were not ubiquitous, conventional, well-known, or generic at the time of invention" make the idea non-abstract. ECF No. 28, at 23. Open Parking further argues that the patents are not directed to "finding an open parking space" or "looking at a parking lot," as ParkMe characterizes them, rather Open Parking says that they are directed to significant technological improvements over what was known at the time of the invention. *Id.* at 23–24. Open Parking maintains that the patents are directed to "concrete

technological solutions that facilitate the task of finding parking and can achieve a 'new and useful' result of allowing a commuter [to] use an 'open parking' mobile app on a smartphone to remotely view a changing occupancy condition of a parking lot when commuting and before arrival so that the commuter can readily locate an available parking space or decide to search for parking elsewhere." *Id.* at 23.

Of course, the "pen and paper" test *is* a valid method to evaluate abstraction.[7] *See, e.g.*, *CyberSource Corp. v. Retail Decisions, Inc.*, 654 F.3d 1366, 1372 (Fed. Cir. 2011) ("[a]ll of [the claim's] method steps can be performed in the human mind, or by a human using a pen and paper" and are therefore unpatentable); *OpenTV, Inc. v. Apple, Inc.*, No. 14-cv-1622, 2015 WL 1535328, at *4 (N.D. Cal. Apr. 6, 2015) (using this analytical tool to find the claims directed to an abstract idea and collecting cases that have also applied it in the computing context). The "pen and paper" framework is also useful here in determining whether these patents are directed at an abstract idea. There exists a meaningful limitation in the representative claim: the rendering of the parking lot occupancy is "substantially real time." Therefore, the function could not be performed by a parking lot attendant handing out maps, as ParkMe suggests. *See* ECF No. 30, at 9. However, the "occupancy condition" of a parking lot, *i.e.* data about whether there are any open spots, could be rendered by humans using a pen and paper. Perhaps there is an attendant at the gate who looks around the lot and writes the number of open spaces on a chalkboard for passersby to see. Or there could be a simple "vacancy/no vacancy" sign outside of a lot, or a "real time" electronic sign showing the then-existing number of open spaces, based on the entry/exit of cars. These examples are means to the same end: transmitting to commuters

[7] Open Parking appears to suggest that the "pen and paper" test requires a showing that pen and paper were actually used somewhere, at some time, to carry out the potentially abstract idea. ECF No. 28, at 29. That is not the law. *See, e.g.*, *CyberSource*, 645 F.3d at 1372; *OpenTV*, No. 14-cv-1622, 2015 WL 1535328, at *4.

whether there are any open spots in a parking lot, via a graphical display and in substantially real time.

This conclusion is bolstered by a common sense reading of the claims. Giving the claim language its ordinary and accustomed meaning, the Court concludes that what the patents are really trying to get at is the transmission of substantially real time data of whether there are any open parking spaces in a given lot. Essentially, the patents are aimed at moving data (open parking spots or not, and maybe where they are) from one place (the parking lot) to another (the driver's location). That is an abstract idea. *See Content Extraction & Trasmission LLC v. Wells Fargo Bank, Nat'l Ass'n*, 776 F.3d 1343, 1347 (Fed. Cir. 2014) (holding that claims were patent-ineligible because they were directed to the abstract idea of data recognition and storage); *Intellectual Ventures I*, 134 F. Supp. 3d at 911 (holding that a patent was directed to the abstract idea of "gathering, storing, and acting on data . . . .").

Information about open parking spaces has long been broadcast to drivers who cannot actually see the open spaces. For example, in many major cities, parking garages in which spots are shielded from view have displays on the outside indicating if (and in some cases how many) spots are vacant. And a drive through the streets outside PNC Park on the evening of a Pirates game reveals any number of people with orange flags waving to cars to indicate there are vacant spots in their lots.[8] Thus, these patents are directed to a longstanding method of organizing human activity that is more akin to the maintenance of medical records or the collection of clinical trial data than to a unique computer database tool. *See Enfish*, 2016 WL 2756255, at *2; *Preservation Wellness*, 2016 WL 2742379, at *3; *eResearch Technology*, 2016 WL 2643264, at *13.

[8] Presumably, those flag wavers stop waving when the lots are full, further corroborating the "substantially real-time" nature of their data transmission.

**c. *Alice Step 2***

**i. The Law**

The answer at *Alice* step one being yes, the Court will proceed to *Alice* step two: "[c]onsidering the elements of each claim both individually and as an ordered combination," are there "additional elements" which present an "inventive concept" that "transform the nature of the claim into a patent-eligible application" by demonstrating it is "significantly more than a patent upon the ineligible concept itself"? *Alice*, 134 S. Ct. at 2355. Clearing the *Alice* step two hurdle requires more than just stating an abstract idea and adding the words "apply it." *Id.* at 2357. The claims must contain additional features that amount to more than "well-understood, routine, conventional activity." *Mayo*, 132 S. Ct. at 1298.

"It is well-settled that mere recitation of concrete, tangible components is insufficient to confer patent eligibility to an otherwise abstract idea." *TLI*, 2016 WL 2865693, at *5. And "the mere recitation of a generic computer cannot transform a patent-ineligible abstract idea into a patent-eligible invention." *Alice*, 134 S. Ct. at 2358. "[F]undamental economic and conventional business practices are often found to be abstract ideas, even if performed on a computer." *Enfish*, slip. op. at 10 (citing *OIP Techs., Inc. v. Amazon.com, Inc.*, 788 F.3d 1359, 1362–63 (Fed. Cir. 2015)).

Courts have also looked to the machine-or-transformation test which, while not the sole test governing § 101 analyses, can provide a "useful clue" at *Alice* step two. *See Bancorp Servs.*, 687 F.3d at 1278. Applying that test can reveal that claims are directed to patent-eligible subject matter if "(1) it is tied to a particular machine or apparatus, or (2) it transforms a particular article into a different state or thing." *In re Bilski*, 545 F.3d 943, 954 (Fed. Cir. 2008).

The most recent guidance from the Federal Circuit on this point came in *TLI Communications*, 2016 WL 2865693. There, the recitations in the claims of a "server," a "telephone unit," and "image analysis unit," and a "control" unit were not enough to surmount the *Alice* step two bar. Those sorts of "vague, functional descriptions of server components [were] insufficient to transform the abstract idea into a patent-eligible invention." *Id.* at *7.

Likewise in *Ultramercial, Inc. v. Hulu, LLC*, 772 F.3d 709, 714 (Fed. Cir. 2014), the Federal Circuit held that invoking the Internet did not save claims directed to a method for monetizing and distributing copyrighted products (citing *Cybersource*, 654 F.3d at 1370, which "reason[ed] that the use of the Internet to verify credit card transaction does not meaningfully add to the abstract idea of verifying the transaction"). Importantly, the Federal Circuit noted that "the transfer of content between computers is merely what computers do and does not change the analysis." *Id.* at 717.

News from the Federal Circuit has not been all bad for software patent holders however. In *DDR Holdings, LLC v. Hotels.com*, 773 F.3d 1245, 1248 (Fed. Cir. 2014), that court upheld claims that were directed to "systems and methods of generating a composite web page that combines certain visual elements of a 'host' website and content of a third-party merchant." The claims did "not merely recite the performance of some business practice known from the pre-Internet world along with the requirement to perform it on the Internet. Instead, the claimed solution [was] necessarily rooted in computer technology in order to overcome a problem specifically arising in the realm of computer networks." *Id.* at 1257; *see also BASCOM Global Internet Servs., Inc. v. AT&T Mobility LLC, et al.*, No. 2015-1763, 2016 WL 3514158, *7 (Fed. Cir. June 27, 2016) (same).

So in general, "when a patent holder seeking to establish § 101 eligibility for an otherwise abstract idea points to a particular element of a patent's claims as solving a computer-centric problem, the claims must specify how that solution works." *Intellectual Ventures I*, 134 F. Supp. 3d at 916 (citing *Source Search Techs., LLC v. Kayak Software Corp.*, 111 F. Supp. 3d 603, 611 (D.N.J. 2015)). Otherwise, a lack of computer-centricity in the problem being solved or the existence of a brick and mortar analog to the solution will be fatal under § 101.

**ii. Application to the '391 and '786 Patents**

Open Parking contends that the '391 and '786 Patents pass muster under *Alice* step two because the otherwise-abstract ideas are limited to "specific emerging handheld wireless devices capable of communications including Internet access." ECF No. 38, at 17. Open Parking further argues that the patents are designed to transmit *parking* data (presumably as opposed to generic data), and besides, you can't transmit that data without a computer. *Id.* at 16–17. And that, according to Open Parking at least, makes these Patents more like those upheld in *DDR* than those that simply implement an abstract idea on a generic computer.[9] The essence of Open Parking's argument is that when these inventions were patented, mobile technology was in its infancy and because these patents were limited to that emerging field, they are patentable.

For its part, ParkMe counters that the claims in the '391 and '786 Patents "recite only generic forms of technology," pointing to the claim language itself which calls for "a wireless device" and "a software application for receiving parking data transmitted over the Internet." ECF No. 39, at 16.

To start, *TLI Communications* seems to facially rebut Open Parking's argument that because the claims mention some computer components there is sufficient transformation under

[9] Open Parking also heavily emphasizes the novelty and unconventional-ness of the invention. *See* ECF No. 38, at 17. That is all well and good, but matters not for the § 101 inquiry which focuses only on abstractness and transformation.

*Alice* step two. *See* ECF No. 38, at 5–11; *TLI Comms.*, 2016 WL 2865693, at *7. Just because the abstract ideas in these patents are to be carried out on some mobile device (even a brand spanking new one in 1999), does not save them from having to pass through the *Alice* sieve. At bottom, the software is being executed on a generic computer. And we know that merely invoking the Internet cannot save the '391 and '786 Patents because transferring data and content—even data and content about parking availability—is "just what computers do." *See Ultramercial*, 772 F.3d at 717.

Nor are these Patents directed to some other problem that is unique to the Internet. *Cf. DDR*, 773 F.3d 1245 (upholding patent-eligibility at *Alice* step two because the patent provided an Internet-based solution to solve a problem unique to the Internet and did not foreclose other ways of solving the problem while reciting specific steps that resulted in a departure from the routine and conventional sequence of events after the click of a hyperlink advertisement). The seemingly ubiquitous problem of finding open parking spaces during the busy morning rush necessarily exists outside of the Internet, and outside computers altogether for that matter. Transmitting that data over the Internet to mobile devices might be useful, but it does not "override[] the routine and conventional sequence of events" pertaining to finding a parking space. *See DDR*, 773 F.3d at 1258. The process is still (1) look for open space, (2) drive to open space, (3) park in open space. With these patents, the driver merely looks to her mobile device rather than through her windshield.

Finally, contrary to Open Parking's suggestion, the machine-or-transformation test does not save these patents either. Limiting the application of these claims to mobile devices capable of accessing the Internet is really just limiting them to one selected form of generic computer technology. *See Ultramercial*, 772 F.3d at 716 ("Narrowing the abstract idea of using advertising

as a currency to the Internet is an 'attempt[] to limit the use' of the abstract idea 'to a particular technological environment,' which is insufficient to save a claim.") (citing *Alice*, 134 S. Ct. at 2358); *see also Inventor Holdings, LLC v. Gameloft, Inc.*, 135 F. Supp. 35 239, 255 (D. Del. 2015) ("Although the claims . . . are limited to a particular technological environment—*i.e.*, mobile devices—this does not save them from being ineligible for patentability."). At bottom, the '391 and '786 Patents describe the shuffling of one type of data over the Internet and with generic computer technology. Those basic computer functions are not directed to a computer-centric problem and thus are not patent-eligible under *Alice* and § 101.

**IV. <u>CONCLUSION</u>**

For the foregoing reasons, the Court concludes that the '391 and '786 patents are directed to patent-ineligible subject matter. Therefore, ParkMe's Motion to Dismiss will be granted, and the Amended Complaint will be dismissed with prejudice.

An appropriate Order will issue.

s/ Mark R. Hornak
Mark R. Hornak
United States District Judge

Dated: June 30, 2016
cc: All counsel of record

US006750786B1

(12) **United States Patent**
**Racunas, Jr.**

(10) **Patent No.: US 6,750,786 B1**
(45) **Date of Patent: *Jun. 15, 2004**

(54) **SYSTEMS AND METHODS FOR INTERNET COMMUNICATION OF PARKING LOT INFORMATION**

(76) Inventor: **Robert Vincent Racunas, Jr.**, 117 Forestwood Dr., Venetia, PA (US) 15367

(*) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 23 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **10/065,359**

(22) Filed: **Oct. 8, 2002**

**Related U.S. Application Data**

(63) Continuation of application No. 09/671,363, filed on Sep. 28, 2000, now Pat. No. 6,501,391.
(60) Provisional application No. 60/156,391, filed on Sep. 28, 1999.

(51) **Int. Cl.**[7] ................................................ **B60Q 1/48**
(52) **U.S. Cl.** ............................... **340/932.2**; 340/539.1; 340/539.11; 340/539.13; 340/928; 235/378; 235/384; 705/13; 705/418
(58) **Field of Search** ............................. 340/932.2, 506, 340/539.1, 539.11, 539.13, 928, 870.02, 870.07, 870.09; 235/378, 384; 194/902; 705/13, 418

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,091,727 A | 2/1992 | Mahmood | |
| 5,432,508 A | 7/1995 | Jackson | |
| 5,504,314 A | 4/1996 | Farmont | |
| 5,648,906 A | 7/1997 | Amirpanahi | |
| 5,748,107 A | 5/1998 | Kersken et al. | |
| 5,751,973 A | 5/1998 | Hassett | |
| 5,877,704 A | 3/1999 | Yoshida | |
| 5,905,247 A | 5/1999 | Ilen | 235/384 |
| 5,910,782 A | 6/1999 | Schmitt et al. | |
| 5,940,481 A | 8/1999 | Zeitman | |

(List continued on next page.)

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| JP | 1995 07-072234 | 3/1995 |
| WO | WO 97/13222 | 4/1997 |
| WO | WO 98/45823 | 10/1998 |
| WO | WO 98/49665 | 11/1998 |
| WO | WO 99/48062 | 9/1999 |
| WO | WO 00/00942 | 1/2000 |
| WO | WO 00/08484 | 2/2000 |
| WO | WO 00/23949 | 4/2000 |
| WO | WO 00/41142 | 7/2000 |
| WO | WO 00/46068 | 8/2000 |
| WO | WO 00/55816 | 9/2000 |
| WO | WO 00/59201 | 10/2000 |
| WO | WO 01/41029 | 7/2001 |

OTHER PUBLICATIONS

Jürgen Grotep Aβ, Final Validation Plan, Project Euroscope (TR1023), Mar. 1999, vol. I, pp. 1–182, Deliverable No. 11, 4th Framework Programme Telematics Applications Programme Transport Sector.
Jürgen Grotep Aβ, Final Validation Plan, Project Euroscope (TR1023), Mar. 1999, vol. II, pp. 1–154, Deliverable No. 11, 4th Framework Programme Telematics Applications Programme Transport Sector.

(List continued on next page.)

*Primary Examiner*—Daryl Pope

(57) **ABSTRACT**

A parking system includes a wireless communications device capable of accessing a server over the Internet and a software application for receiving parking data transmitted over the Internet to the wireless communications device. The wireless communications device can render the parking data as a substantially real-time representation indicating an occupancy condition of an available parking lot. The occupancy condition changes according to presence and absence of vacant parking spaces within the available parking lot.

**71 Claims, 5 Drawing Sheets**



U.S. PATENT DOCUMENTS

| | | | | | |
|---|---|---|---|---|---|
| 6,037,880 | A | | 3/2000 | Manion | |
| 6,081,206 | A | | 6/2000 | Kielland | |
| 6,097,313 | A | | 8/2000 | Takahashi et al. | |
| 6,107,942 | A | | 8/2000 | Yoo et al. | |
| 6,112,152 | A | | 8/2000 | Tuttle | |
| 6,124,808 | A | | 9/2000 | Budnovitch | |
| 6,138,072 | A | | 10/2000 | Nagai | |
| 6,142,702 | A | | 11/2000 | Simmons | |
| 6,147,624 | A | | 11/2000 | Clapper | |
| 6,148,253 | A | | 11/2000 | Taguchi et al. | |
| 6,169,897 | B1 | | 1/2001 | Kariya | |
| 6,178,377 | B1 | | 1/2001 | Ishihara et al. | |
| 6,202,008 | B1 | | 3/2001 | Beckert et al. | |
| 6,205,396 | B1 | | 3/2001 | Teicher et al. | |
| 6,208,934 | B1 | | 3/2001 | Bechtolsheim et al. | |
| 6,209,026 | B1 | | 3/2001 | Ran et al. | |
| 6,229,455 | B1 | | 5/2001 | Yost et al. | |
| 6,230,868 | B1 | | 5/2001 | Tuxen et al. | |
| 6,236,337 | B1 | | 5/2001 | Beier et al. | |
| 6,243,029 | B1 | | 6/2001 | Tomer | |
| 6,246,337 | B1 | | 6/2001 | Rosenberg et al. | |
| 6,249,233 | B1 | | 6/2001 | Rosenberg et al. | |
| 6,252,523 | B1 | | 6/2001 | Moström | |
| 6,253,980 | B1 | | 7/2001 | Murakami et al. | |
| 6,259,991 | B1 | | 7/2001 | Nysen | 701/300 |
| 6,266,609 | B1 | | 7/2001 | Fastenrath | |
| 6,272,332 | B1 | | 8/2001 | Matsumoto et al. | 455/412 |
| 6,278,941 | B1 | | 8/2001 | Yokoyama | 701/209 |
| 6,282,491 | B1 | | 8/2001 | Bochmann et al. | 701/209 |
| 6,310,561 | B1 | | 10/2001 | Nomura et al. | 340/905 |
| 6,333,702 | B1 | | 12/2001 | Hiyokawa et al. | 340/995 |
| 6,336,072 | B1 | | 1/2002 | Takayama et al. | 701/200 |
| 6,340,935 | B1 | | 1/2002 | Hall | 340/932.2 |
| 6,349,259 | B1 | | 2/2002 | Sato | 701/207 |
| 6,374,182 | B2 | | 4/2002 | Bechtolsheim et al. | 701/209 |
| 6,405,125 | B1 | | 6/2002 | Ayed | 701/200 |
| 6,411,895 | B1 | | 6/2002 | Lau et al. | 701/209 |
| 6,411,937 | B1 | | 6/2002 | Brusseaux | 705/21 |
| 6,421,606 | B1 | | 7/2002 | Asai et al. | 701/209 |
| 6,424,916 | B2 | | 7/2002 | Nysen | 701/300 |
| 6,434,478 | B1 | | 8/2002 | Ikeda | 701/200 |
| 6,434,479 | B1 | | 8/2002 | Kondou et al. | 701/203 |
| 6,453,235 | B1 | | 9/2002 | Endo et al. | 701/211 |
| 6,493,676 | B1 | | 12/2002 | Levy | 705/13 |
| 6,501,391 | B1 | * | 12/2002 | Racunas | 340/932.2 |
| 6,502,011 | B2 | | 12/2002 | Haag | 700/217 |
| 6,519,329 | B1 | | 2/2003 | Hjelnvik | 379/106.01 |
| 6,519,528 | B2 | | 2/2003 | Endo et al. | 701/211 |
| 6,526,285 | B1 | | 2/2003 | Matsumoto et al. | 455/457 |
| 6,553,308 | B1 | | 4/2003 | Uhlmann et al. | 701/208 |
| 2003/0088637 | A1 | | 5/2003 | Hatano et al. | 709/216 |

OTHER PUBLICATIONS

Jürgeb Grotep Aβ, Evaluation Results and Comparative Assessment, Project Euroscope (TR1023), Apr. 1999, pp. 1–6, Deliverable No. 15, 4th Framework Programme Telematics Applications Programme Transport Sector.

Jürgen Grotep Aβ, Evaluation Results and Comparative Assessment (Phase I), Project Euroscope (TR1023), Apr. 1999, pp. 1–89, Deliverable No. 15–Part I, 4th Framework Programme Telematics Applications Programme Transport Sector.

Jürgen Grotep Aβ, Evaluation Results and Comparative Assessment (Phase I), Project Euroscope (TR1023), Apr. 1999, pp. 1–237, Deliverable No. 15–Part II, 4th Framework Programme Telematics Applications Programme Transport Sector.

Jürgen Grotep Aβ, Project Recommendations Euroscope Book, Project Euroscope (TR1023), Oct. 1999, pp. 1–123, Deliverable No. 16, 4th Framework Programme Telematics Applications Programme Transport Sector.

Tommi Ojala and Franc Klomp, Specification of Promise Services, Promise Personal Mobile Traveller and Traffic Information Services TR1043, Jul. 1996, pp. 1–96, Deliverable D3.1, Telematics Application Programme A2, Transport.

Peter Green, Matti Karlsson, Thomas Schütt, Paul Randall and Rob Kunst, Generic Promise System Architecture, Promise Personal Mobile Traveller and Traffic Information Service TR1043, Sep. 1996, pp. 1–27, Deliverable D4.1, Telematics Application Programme A2, Transport.

Jérome Hénique, Evaluation Plan, Promise Personal Mobile Traveller and Traffic Information Service TR1043, Apr. 1997, pp. 1–100, Deliverable D7.1, Telematics Application Programme A2, Transport.

Tommi Ojala, Peter Green, Ian Bonner and Edwin Bastiaensen, Final Evaluation Report of Promise Demonstrations, Promise Personal Mobile Traveller and Traffic Information Service TR1043, Jan. 1999, pp. 1–142, Deliverable D7.4, Telematics Application Programme A2, Transport.

Paul Randall, Peter Green, Thomas Schütt, Edwin Bastiaensen, Jan De Jong, Timo Horelli, Tommi Ojala and Xavier Mirabaud, The Business Case for Promise Services, Promise Personal Mobile Traveller and Traffic Information Service TR1043, Jan. 1999, pp. 1–74, Deliverable D8.1, Telematics Application Programme A2, Transport.

Tommi Ojala and Aki Lumiaho, Summary of Promise Public Relations Activities, Promise Personal Mobile Traveller and Traffic Information Service TR1043, Feb. 1999, pp. 1–39, Deliverable D2.1, Telematics Application Programme A2, Transport.

Tommi Ojala and Aki Lumiaho, Final Report TR1043, Promise Personal Mobile Traveller and Traffic Information Service, Feb. 1999, pp. 1–26, Telematics Application Programme Transport.

Peter Hasberg and Dr. Dirk Serwill, *The Stadtinfokoln Project in Cologne Information as the Key to Mobility and Traffic Management*, ECMT/OECD, Dec. 1999.

Netsystec GmbH, *Video Shuttle by NETSYSTEC being used in Cologne's Traffic Information Service www.koelnverkehr.de*, Dec. 25, 1999 Press Release available at http://www.netsystec.com/eng1/presse/artikel/VS16_keolnverkehr.htm.

English translation of German web site http://www.koelnverkehr.de available at http://translate.google.com/translate?hl=en&sl=de&u=http://www.koelnverkehr.de/&prev=/search%3Fq%Dkoelnverkehr%26hl%Den%26safe%3Doff.

Shark Byte Systems, Inc., *New Revenue System Runs Exclusively on the Net*, Parking Today, Mar. 2000 Press Release, available at http://www.sharkbytesystems.com/press/1.htm.

Schlumberger, *Schlumberger and Webraska Partner Up for World's First Demonstration of Hassel–free Parking Using WAP Mobile Phones*, Mar. 2000 Press Release, available at http://www.slb.com/print_pr.cfm?prid=1321&printable=1.

Shark Byte Systems, Inc., *The Internet Revolution Comes to Parking*, Parking, Apr. 2000 Press Release, available at http://www.sharkbytesystems.com/press/2.htm.

http://www.parking.org/cgi–bin/rbox/get/forums/software.html, hardcopy printout, pp. 1–4.

http://www.parking.org/cgi–bin/rbox/get/forums/software/20.html, hardcopy printout, p.1.

http://www.parking.org/cgi–bin/rbox/get/forums/software/20/1.html, hardcopy printout, p.1.

http://www.tele–parking.com, pp. 1–42.

Keith Gavin, *Parking Guidance Comes of Age*, Urban Mobility Professional, Jan. 1999, Issue 7, available at http://docs.vircomnet.com /mobility/parking__vc/Papers__Full__Documents__K.Gavin__0001__0001.htm.

Nikos I. Leoutsarakos, *Management Technology for the Private Parking Industry*, Urban Mobility Professional, Jan. 1999, Issue 7, available at http://docs.vircomnet.com/mobility/ parking__vc/leoutsarakos0002.htm.

Nikos I. Leoutsarakos, *Parking On Street Goes Wireless*, Urban Mobility Professional, Jan. 1999, Issue 7, available at http://docs.vircomnet.com/ Mobility/parking__vd/leoutsarakos0002.htm.

Jek Kian Jin, *Driver Upgrades*, Life! Section of Straits Times, Jun. 1999, available at http://www.best.com/~kianjin/sv–life/sv–erpcam.html.

Ford Motor Company, *Ford takes the stress out of city driving*, Jun. 1999, available at http://www.media.ford.com/article__display.cfm?article__id=1914.

Webraska, *Alcatel va intégrer la techologie de Webraska pour fournir des serivces de cartographie aux utilisateurs de GSM*, Jul. 1999, available at http://www.webraska.com/press/99–jul–1–fr.html.

Mobic: *Alcatel and Webraska Partner to Provide Location–Based Services to GSM Users*, Jul. 1999, available at http://www.mobic.com/news/9907/ alcatel__and __webraska__partner__to__.htm.

Andrew Ryder, *No Place to Park*, Heavy Duty Trucking, Jul. 1999, available at http://www.heavytruck.com/hdt/1999/07/020a9907.html.

Dr. Andreas Scholtz, *Parking Technology Beyond the Year 2000*, Oct. 1999, available at http://docs.vircomnet.com/mobility/parking__vc/ Andreas__Scholtz.doc and http://www.parking–net.com.

Netsystec GmbH, *Video Broadcast System for Providers*, Nov. 25, 1999 Press Release available at http://www.netsystec.com/engl/presse/artikel/ VS16__PowerEngine.htm.

Johnson City Med–Tech Corridor Its Project, *Geographic Information Systems* (*GIS*) *Phase I Review and Phase II Prospectus*, Oct. 1996, available at http://www.itsdocs.fhwa.dot.gov/%5CJPODOCS%5CREPTS__TE/ L401!.PDF.

Mitsui & Co Ltd., *Mitsui and Park 24 Establish Tie–Up For Providing Information on Parking Lots and Plan to Offer Related Information on a Real–Time Basis*, Jan. 1997 Press Release, available at http://www.mitsui.co.jp/tkabz/ english/news/1997/971park.htm.

Bikash Ron Pati, *Evaluation of Parking Guidance Systems: A Unique Approach*, 1997, Flite, available at http://uftrc.ce.ufl.edu/fsite/pati.htm.

Its, *Parking Information–Osaka City: Parking space guidance system*, Its Handbook 1998, Section 4: Its Toward Standard Deployment, available at http://www.its.go/jp/ITS/1998HBook/chapter4/4–8e.html.

*Real Time Traffic Information Systems*, Published as a Supplement to H&T, Mar. 1998.

European Commission, *West European Local Legal Arrangements for Transport Information management and Exchange of Data*, Apr. 1998, available at http://www.rupprecht–consult.de/wtforeport.pdf and http://www.rupprecht–consult.de/wtfnreport.pdf.

Namgeun Jeong, Youngsu Chae, Aparna Pappu, Shashidhar Merugu, and Ramkumar Krishnan, EZPark/Ransy Project, Oct. 1998, available at http://www.cc.gatech.edu/classes/cs6751__98__fall/projects/ Ransy/.

Winfried Krux, Peter Hasberg, and Klaus Overkamp, *Cologne ParkInfo A Contribution to Traffic Control Compatible with Environment and Urban Development*, Presentation on the 5*th* Its World Congress, Oct. 1998, available at http://152.99.129.29/cdrom/2147.pdf.


* cited by examiner


10
Controller
11
17
12
18
13
PARKING LOT
14
PARKING LOT
20
19
INTERNET
15
21
16

FIG. 1


100
Controller
11
17
12
PARKING LOT
13
18
19
INTERNET
15
21
175
Display
176
TV Remote
170
Input/Output
169
TV Tuner
168
Communication Device
167
CPU
162
MEMORY
163
Operating System
164
Authoring Application(s)
165
Client Application(s)
166
Browser Application(s)
171
Mouse
174
Keyboard
173
PDA
172
Mobile Phone
16
161
Controller
160

FIG. 2


RETRIEVE STATUS INFORMATION FROM ONE OR MORE PARKING LOTS
S10
PERFORM DATA PROCESSING TO CONVERT STATUS INFORMATION INTO PARKING LOT OCCUPANCY DATA
S20
TRANSMIT PARKING LOT OCCUPANCY DATA OVER THE INTERNET
S30

FIG. 3


ACCEPT SUBSCRIPTIONS FROM A PLURALITY OF SUBSCRIBERS
S100
PROVIDE INTERNET ACCESS TO PARKING LOT OCCUPANCY DATA FOR THE PLURALITY OF SUBSCRIBERS
S200
CHARGE AND BILL SUBSCRIBERS
S300

FIG. 4

FIG. 5


File Edit View Favorites Tools Help
Back
Forward
Stop
Refresh
Home
Search
Favorites
History
Mail
Print
Edit
Discuss
Real.com
Address http://www.openparking.com/metrorail/vienna.html
Go
Links
Vienna MetroRail Parking
September 28, 2000
7:57 a.m.
Lot A
Status : Open
Spaces Remaining : 5
Internet
Start
7:57 AM

# SYSTEMS AND METHODS FOR INTERNET COMMUNICATION OF PARKING LOT INFORMATION

## CROSS REFERENCE TO RELATED APPLICATIONS

This application is a continuation of U.S. patent application Ser. No. 09/671,363, filed on Sep. 28, 2000, which issued as U.S. Pat. No. 6,501,391 on Dec. 31, 2002 and claims priority to U.S. provisional application 60/156,391, filed on Sep. 28, 1999.

## BACKGROUND OF INVENTION

The present invention relates generally to systems and methods for communication over the Internet. More particularly, the present invention relates to systems and methods for communication of parking lot information over the Internet.

Locating a vacant parking space is an ordeal that causes frustration for many commuters. Even if a commuter pays to enter a parking lot, valuable time is consumed searching for a parking space within the parking lot. It seems that parking lots that service hospitals, airports, mass transit stations, entertainment forums, shopping malls and the like are always the most crowded, when time is the most crucial. As urban and suburban regions become more populated, finding a vacant parking space will become increasingly difficult for commuters.

Several prior art devices have attempted to facilitate locating a parking space. In particular, U.S. Pat. No. 5,293,163 to Kakihara et al. ('163 patent) discloses a system for locating garages with available parking spaces. According to the '163 patent, the location of a parking garage having available parking is displayed in map format.

U.S. Pat. No. 5,432,508 to Jackson ('508 patent) discloses a technique for informing vehicle operators of available parking spaces in a parking garage. According to the '508 patent, light sources mounted above the parking spaces and at the entrance to the parking garage are used to indicate the location of available spaces. The '508 patent also discloses a computer which collects information concerning parking availability and communicates the information to prospective users. Namely, a person can place a telephone call and receive a voice message indicating whether the parking lot is full.

U.S. Pat. No. 5,910,782 to Schmitt et al. ('782 patent) discloses a system for finding available on-street parking using an on-board vehicle navigation system and parking meters equipped with sensing devices. According to the '782 patent, real time metered parking space information can be accessed from a central location or directly by a vehicle, upon entering a specific geographic area.

U.S. Pat. No. 5,940,481 to Zeitman ('481 patent) discloses a parking management control system used to report parking, monitor parking and reserve parking spaces. According to the '481 patent, a user reports parking in a particular parking facility to a central control unit using a personal non-dedicated mobile communications device. The central control unit then confirms whether parking in the particular parking facility is authorized or not. The central control unit also generates a report indicating which parking facilities are supposed to be vacant for law enforcement officials so that unauthorized parking can be ticketed. The '481 patent also discloses that a user can reserve a desired parking facility by selecting a desired parking facility from a map provided from the central control unit. If a potential user, other than the registered user, communicates a request to park in the reserved parking facility, the control unit transmits a response to the potential user indicating that the parking facility is reserved and not authorized for use.



At present, however, no prior art device utilizes the capabilities of the Internet to display a real-time representation of a parking lot indicating vacant parking spaces.

## SUMMARY OF INVENTION

A parking system includes a wireless communications device capable of accessing a server over the Internet and a software application for receiving parking data transmitted over the Internet to the wireless communications device. The wireless communications device can render the parking data as a substantially real-time representation indicating an occupancy condition of an available parking lot. The occupancy condition changes according to presence and absence of vacant parking spaces within the available parking lot.

Aspects of the present invention may be implemented by an apparatus and/or by a computer program stored on a computer readable medium. The computer readable medium may comprise a disk, a client device, a network device, a host device, and/or a propagated signal.

Other features and advantages will be apparent from the following description, including the drawings, and from the claims.

## BRIEF DESCRIPTION OF DRAWINGS

FIG. **1** is a block diagram of a communication network.

FIG. **2** is an expansion of the block diagram of FIG. **1**.

FIG. **3** is a flow chart of a communications method.

FIG. **4** is a flow chart of a communications method.

FIG. **5** is a graphical user interface.

## DETAILED DESCRIPTION

FIG. **1** illustrates a communication network **10** according to one embodiment of the present invention. The communication network includes a controller **11** for commanding a server **12** to transmit parking lot occupancy data corresponding to one or more parking lots **13**, **14** through the Internet **15**. For simplicity, only the basic components of the communication network **10** are shown. However, as would be understood by one of ordinary skill in the art, the communication network may include various other components and structures in actual implementation. For instance, although a first parking lot **13** and a second parking lot **14** are shown, the communication network may include only one parking lot or numerous parking lots.

The server **12** may be any type computer, computer system, server, settop box or other type of Internet-accessible device and may include any type of hardware, software, application and/or program capable of functioning as described herein. The server **12** may be located at the site of one or more of the parking lots **13**, **14** and/or may be located at a remote location.

As indicated by the broken lines, the controller **11** may be either internal or external to the server **12**. An example a controller **11** is a software application loaded on the server **12** for commanding and directing communications enabled by the server **12**. Other examples include a program, a piece of code, an instruction, a device, a computer, a computer system, and/or a combination thereof, for independently or collectively instructing the server **12** to interact and operate

as described herein. The controller **11** may be embodied permanently or temporarily in any type of machine, component, and/or equipment. The controller **11** transmits commands to the server **12** through a first connection **17**, which may be any communication path capable of carrying commands between the controller **11** and the server **12**.

As shown in FIG. **1**, the server **12** is connected to the first parking lot **13** through a second connection **18**. The second connection may be a serial, modem, telephone, cable, satellite, LAN (Local Area Network) including one or more other computers (not shown) or any other connection capable of carrying data between the first parking lot **13** and the server **12**. The server **12** also is connected to the second parking lot **14** through the Internet **15** through a third connection **19** and a fourth connection **20**. The third connection **19** and the fourth connection **20** may be any type of modem, cable, satellite or other type of connection capable of carrying data through the Internet **15** between the second parking lot **14** and the server **12**. Each of the third connection **19** and fourth connection **20** may also include one or more intermediary computer systems or servers (not shown), such as an ISP (Internet Service Provider).

The first parking lot **13** and the second parking lot **14** may be any parking lot that services a hospital, airport, mass transit station, entertainment forum, shopping mall, department store, grocery store or the like. Each of the first parking lot **13** and the second parking lot **14** are equipped with detectors (not shown) for detecting the status information for each of the parking lots **13**, **14**. The detectors may be any type of device (e.g., position detectors, motion detectors, weight detectors, video cameras, etc.) capable of ascertaining whether a parking space is occupied or not. The detected status information includes at least the location of vacant parking spaces within the parking lots **13**, **14**. The status information, however, may include the occupancy status of every parking space within the parking lots **13**, **14** or any other information concerning the status of the parking lots **13**, **14**. The first parking lot and second parking lot are also equipped with communication devices (not shown) for communicating the status information to the server **12**. The communications devices may be any type of internal or external device such as a computer, server, application, and/or program capable of conveying the status information to the server **12**. For example, the communication devices may be the detectors of the parking lots **13**, **14** or may be a terminal at the parking lots **13**, **14** for collecting and communicating status information.

Referring again to FIG. **1**, the server **12** is connected to a remote display device **16** through the Internet **15** through the third connection **19** and a fifth connection **21**. The fifth connection **21** may be any type of modem, cable, satellite or other type of connection capable of carrying data through the Internet **15** between the server **12** and the remote display device **16**.

The remote display device **16** may be any type computer, computer system, server, settop box or other type of Internet-accessible device and may include any type of hardware, software, application or program capable of executing the functions described herein. The display device **16** may include applications that enable textual or graphical display of information, such as an email application or an Internet browser application. The remote display device **16** may be a wired or wireless device structured and arranged to access the Internet from home, office, vehicle, and/or any other location. For example, the remote display device **16** may be personal computer (PC) and/or a portable device, such as a vehicle-mounted device or a hand-held device (e.g., PDA and/or mobile telephone having Internet access). The remote display device **16** may communicate with the server **12** through the Internet **15** and through wired or wireless communication pathways **19**, **21**.

FIG. **2** illustrates a communication network **100** including a display device **16** communicating with a server **12** through the Internet **15**. The server **12** may include one or more server controllers **11** for controlling the server **12**. Communication pathway **19** and communication pathway **21** enable wired or wireless communication between the server **12** and the display device **16** through the Internet **15**.

The display device **16** may include one or more device controllers **160** for controlling the display device **16**. An example of device controller **160** is a software application loaded on the display device **16** for commanding and directing communications enabled by the display device **16**. Other examples include a program, a piece of code, an instruction, a device, a computer, a computer system, or a combination thereof, for independently or collectively instructing the display device **16** to interact and operate as described herein. The device controller **160** may be embodied permanently or temporarily in any type of machine, component, equipment, storage medium, or propagated signal capable of providing instructions to the client device **16**.

In one implementation, the display device **16** is a PC and/or a portable device, such as a vehicle-mounted device or a hand-held device (e.g., PDA and/or mobile telephone). The display device **16** includes a general purpose computer **161** having an internal or external storage **162** for storing data and programs such as an operating system **163** (e.g., DOS, Windows™, Windows 95™, Windows 98™, Windows 2000™, Windows NT™, OS/2, or Linux) and one or more application programs. Examples of application programs include authoring applications **164** (e.g., word processing, database programs, spreadsheet programs, or graphics programs) capable of generating documents or other electronic content; client applications **165** capable of communicating with other computer users, accessing various computer resources, and viewing, creating, or otherwise manipulating electronic content; and browser applications **166** (e.g., Netscape's Navigator or Microsoft's Internet Explorer) capable of rendering standard Internet content.

The general-purpose computer **161** also includes a central processing unit (CPU) **167** for executing instructions in response to commands from the device controller **160**. In one implementation, the device controller **160** includes one or more of the application programs installed on the internal or external storage **162** of the general-purpose computer **161**. In another implementation, the device controller **160** includes application programs externally stored in and performed by one or more device(s) external to the general-purpose computer **160**.

The general-purpose computer typically will include a communication device **168** for sending and receiving data. One example of the communication device **168** is a modem. Other examples include a transceiver, a set-top box, a communication card, a satellite dish, an antenna, or another network adapter capable of transmitting and receiving data over wired or wireless data pathway **21**. The general-purpose computer **161** also may include a TV ("television") tuner **169** for receiving television programming in the form of broadcast, satellite, and/or cable TV signals. As a result, the display device **16** can selectively and/or simultaneously display Internet content received by communications device **168** and television programming content received by the TV tuner **169**.

The general-purpose computer **161** may include an input/output interface **170** for wired or wireless connection to various peripheral devices. Examples of peripheral devices include, but are not limited to, a mouse **171**, a mobile phone **172**, a personal digital assistant **173** (PDA), a keyboard **174**, an on-board vehicle or PC display monitor **175** with or without a touch screen input, and/or a TV remote control **176** for receiving information from and rendering information to subscribers.

Although FIG. **2** illustrates devices such as a mobile telephone **172**, a PDA **173**, and a TV remote control **176** as being peripheral with respect to the general-purpose computer **161**, in another implementation, such devices may include the functionality of the general-purpose computer **161** and operate as the display device **16**. For example, the mobile phone **172** or the PDA **173** may include computing and networking capabilities and function as a display device **16** by accessing the Internet **15** and communicating with the server **12**. Furthermore, the display device **16** may include one, some or all of the components and devices described above.

The operation of one implementation of the present invention will now be described with reference to FIG. **3**.

In response to commands from the controller **11**, the server **12** retrieves status information from one or more of the parking lots **13**, **14** (**S10**). This may entail the controller **11** commanding the server **12** to poll or query the occupancy status of the parking lots **13**, **14** or commanding the server **12** to accept status information periodically sent from the parking lots **13**, **14**.

After the server **12** has retrieved the status information, the controller **11** instructs the server **12** to perform data processing in order convert the status information into parking lot occupancy data capable of being reproduced by a remote display device **16** (**S20**). Such data processing may or may not be required depending on the form of the retrieved status information.

The controller **11** then commands the server **12** to transmit the parking lot occupancy data over the Internet **15** (**S30**). The parking lot occupancy data corresponds to one or more of the parking lots **13**, **14** and is capable of being reproduced by a remote display device **16** as a real-time representation of the parking lot **13**, **14** indicating vacant parking spaces within the parking lots **13**, **14**. The real-time representation may be in the form of a textual listing, a graphical map, a video image, an Internet Web page or similar form and may indicate occupied parking spaces as well as reserved parking spaces.

Using a remote display device, a commuter can view the real-time representation of the parking lot and can readily locate an available parking space or decide to search for parking elsewhere.

The operation of another embodiment of the present invention will now be described with reference to FIG. **3**. In this embodiment of the present invention, the controller **11** commands the server **12** to accept subscriptions from a plurality of subscribers (**S100**). The controller **11** commands the server **12** to provide Internet accessibility to parking lot occupancy data corresponding to at least one parking lot for the plurality subscribers (**S200**). Subscribers may access the real-time representation through the Internet by visiting a Web site or transmitting an email request, for example. The server **12** may provide access for a fee. Accordingly, the controller **11** may command the server **12** to appropriately charge and bill subscribers (**S300**).

Again, the parking lot occupancy data capable is capable of being reproduced by each of the remote display devices as a real-time representation of the parking lot indicating at least vacant parking spaces within the parking lot. The real-time representation may be in the form of a textual listing, a graphical map, a video image, an Internet Web page or a combination of such forms and may indicate occupied parking spaces as well as reserved parking spaces. FIG. **5** is one example of a graphical user interface that may be displayed to a commuter.



As described above, the present invention will facilitate a commuter's search for a parking space by utilizing the capabilities of the Internet to display a real-time representation of available parking spaces within a parking lot.

It should be understood that the embodiments described above are only examples of the present invention and are not intended to limit the scope of the following claims.

What is claimed is:

**1**. A parking system comprising:

a wireless communications device capable of accessing the Internet; and

a software application for receiving parking data transmitted over the Internet to the wireless communications device, wherein

the parking data can be rendered by the wireless communications device as a substantially real-time representation indicating an occupancy condition of an available parking lot, and

the occupancy condition changes according to presence and absence of vacant parking spaces within the available parking lot.

**2**. The parking system of claim **1**, wherein the wireless communications device comprises a vehicle-mounted device.

**3**. The parking system of claim **1**, wherein the wireless communications device comprises a portable device.

**4**. The parking system of claim **1**, wherein the available parking lot comprises a parking lot in geographic proximity to the wireless communications device.

**5**. The parking system of claim **1**, wherein the available parking lot comprises a parking lot in geographic proximity to a travel destination.

**6**. The parking system of claim **1**, wherein the parking data corresponds to a plurality of parking lots.

**7**. The parking system of claim **1**, wherein the representation comprises a map.

**8**. The parking system of claim **7**, wherein the map comprises a location of at least one available parking lot having an occupancy condition corresponding to at least one vacant parking space being present within the available parking lot.

**9**. The parking system of claim **7**, wherein the map comprises a location of at least one available parking space within an available parking lot having an occupancy condition corresponding to at least one vacant parking space being present within the available parking lot.

**10**. The parking system of claim **7**, wherein the map represents a plurality of parking lots.

**11**. The parking system of claim **1**, wherein the representation comprises number of vacant spaces present within the available parking lot.

**12**. The parking system of claim **1**, wherein the representation comprises reserved parking spaces.

**13**. The parking system of claim **3**, wherein the portable device comprises a mobile telephone.

**14**. The parking system of claim **3**, wherein the portable device comprises a personal digital assistant.

**15**. A method comprising:

providing Internet access to parking data corresponding to one or more parking lots, wherein

the parking data is transmitted over the Internet to one or more wireless communications devices,

the parking data can be rendered using a wireless communications device as a substantially real-time representation of one or more parking lots, the substantially real-time representation indicating an occupancy condition of each of the one or more parking lots, and

the occupancy condition of each parking lot changes according to presence and absence of vacant parking spaces within each parking lot.

**16**. The method of claim **15** further comprising accepting a subscription from at least one subscriber.

**17**. The method of claim **15**, wherein the parking data is accessed from a server located at one of the parking lots.

**18**. The method of claim **15**, wherein the parking data is accessed from a server at a remote location.

**19**. The method of claim **15**, wherein the representation comprises a map identifying a location of at least one available parking lot having an occupancy condition corresponding to at least one vacant parking space being present within the available parking lot.

**20**. The method of claim **15**, wherein the representation comprises a map identifying a location of at least one available parking space within an available parking lot having an occupancy condition corresponding to at least one vacant parking space being present within the available parking lot.

**21**. The method of clam **15**, wherein the representation comprises reserved parking spaces.

**22**. The method of claim **15**, wherein the representation comprises a reserved parking space for which a commuter has a reservation.

**23**. The method of claim **15**, wherein the wireless communications device comprises a portable device.

**24**. The method of claim **23**, wherein the portable device comprises a mobile telephone.

**25**. The method of claim **23**, wherein the portable device comprises a personal digital assistant.

**26**. A system comprising:

means for accessing the Internet through at least one wireless connection; and

means for receiving parking data through the at least one wireless connection, wherein

the parking data represents a substantially real-time occupancy condition of one or more parking lots, and

the occupancy condition of each of the one or more parking lots is based on presence and absence of vacant parking spaces within each of the one or more parking lots.

**27**. The system of claim **26**, wherein at least one of the means for accessing and the means for receiving is included in a vehicle.

**28**. The system of claim **26**, wherein at least one of the means for accessing and the means for receiving is included in a portable device.

**29**. The parking system of claim **28**, wherein the portable device comprises a mobile telephone.

**30**. The parking system of claim **28**, wherein the portable device comprises a personal digital assistant.

**31**. The system of claim **26**, further comprising means for presenting the occupancy condition of the one or more parking lots.

**32**. The system of claim **31**, wherein the means for presenting comprises a touch screen display.



**33**. The system of claim **31**, wherein the means for presenting is included in a vehicle.

**34**. The system of claim **31**, wherein the means for presenting is included in a portable device.

**35**. The system of claim **34**, wherein the portable device comprises a mobile telephone.

**36**. The system of claim **34**, wherein the portable device comprises a personal digital assistant.

**37**. The system of claim **31**, wherein the means for presenting displays an indication that a parking lot includes one or more vacant spaces.

**38**. The system of claim **37**, wherein the indication comprises one or more of an icon, a text message, and a number corresponding to vacant spaces within the parking lot.

**39**. The system of claim **31**, wherein the means for presenting displays a map.

**40**. The system of claim **39**, wherein the map comprises at least one parking lot location.

**41**. The system of claim **40**, wherein the at least one parking location is geographically proximate to a user of the system.

**42**. The system of claim **40**, wherein the at least one parking location is geographically proximate to a travel destination.

**43**. The system of claim **40**, wherein the map comprises a plurality of parking lot locations and at least one of the plurality of parking lot locations corresponds to a parking lot having one or more vacant spaces.

**44**. The system of claim **39**, wherein the map comprises a location of at least one vacant space within a parking lot.

**45**. The system of claim **39**, wherein the map comprises a location of at least one occupied space within a parking lot.

**46**. The system of claim **39**, wherein the map comprises a location of at least one reserved space within a parking lot.

**47**. The system of claim **26**, wherein one or more of the parking lots are geographically proximate to a user of the system.

**48**. The system of claim **26**, wherein one or more of the parking lots are geographically proximate to a travel destination.

**49**. A system comprising:

means for accessing the Internet through at least one wireless connection; and

means for transmitting parking data through the at least one wireless connection, wherein

the parking data represents a substantially real-time occupancy condition of one or more parking lots, and

the occupancy condition of each of the one or more parking lots is based on presence and absence of vacant parking spaces within each of the one or more parking lots.

**50**. The system of claim **49**, wherein at least one of the means for accessing and the means for transmitting is included in a detector.

**51**. The system of claim **49**, wherein at least one of the means for accessing and the means for transmitting is included in a terminal.

**52**. A system comprising:

data communications means for receiving data over a wireless connection from a server configured to provide one or more services to a subscriber; and

display means for presenting substantially real-time information based on the data received from the data communications means, wherein

the server receives updated parking data over the Internet, and

the display means presents a substantially real-time occupancy condition of one or more parking lots.

**53**. The system of claim **52**, wherein at least one of the data communications means and the display means is included within a vehicle.

**54**. The system of claim **52**, wherein at least one of the data communications means and the display means is included within a portable device.

**55**. The system of claim **54**, wherein the portable device comprises a mobile telephone.

**56**. The system of claim **54**, wherein the portable device comprises a personal digital assistant.

**57**. The system of claim **52**, wherein the display means comprises a touch screen.

**58**. The system of claim **52**, further comprising storage means for storing a software application that controls the data communications means.

**59**. A parking system comprising:

a server that is accessible over the Internet by a display device; and

a software application that instructs the server to transmit parking data over the Internet to the display device, wherein

the parking data can be rendered by the display device as a substantially real-time representation,

the representation comprises a map displaying a location for each of a plurality of parking lots,

the representation indicates an occupancy condition for one or more of the parking lots, and

the occupancy condition changes according to presence and absence of vacant parking spaces within the one or more parking lots.

**60**. The parking system of claim **59**, wherein the representation comprises a Web page.

**61**. The parking system of claim **59**, wherein the map comprises a location of a parking lot having an occupancy condition corresponding to at least one vacant parking space being present within the parking lot.

**62**. The parking system of claim **59**, wherein the map comprises a location of a parking lot having an occupancy condition corresponding to no vacant parking spaces being present within the parking lot.

**63**. The parking system of claim **59**, wherein the occupancy condition comprises number of vacant parking spaces.

**64**. The system of claim **59**, wherein at least one of the parking lots is geographically proximate to the display device.

**65**. The system of claim **59**, wherein at least one of the parking lots is geographically proximate to a travel destination.

**66**. The parking system of claim **59**, wherein the display device comprises a personal computer.

**67**. The parking system of claim **59**, wherein the display device comprises a wireless communications device.

**68**. The parking system of claim **67**, wherein the wireless communications device comprises a vehicle-mounted device.

**69**. The parking system of claim **67**, wherein the wireless communications device comprises a portable device.

**70**. The parking system of claim **69**, wherein the portable device comprises a mobile telephone.

**71**. The parking system of claim **69**, wherein the portable device comprises a personal digital assistant.

* * * * *

US006501391B1

(12) **United States Patent**
**Racunas, Jr.**

(10) **Patent No.: US 6,501,391 B1**
(45) **Date of Patent: Dec. 31, 2002**

(54) **INTERNET COMMUNICATION OF PARKING LOT OCCUPANCY**

(76) Inventor: **Robert Vincent Racunas, Jr.**, 4043 Heatherstone Ct., Fairfax, VA (US) 20030

(*) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 23 days.

(21) Appl. No.: **09/671,363**

(22) Filed: **Sep. 28, 2000**

**Related U.S. Application Data**

(60) Provisional application No. 60/156,391, filed on Sep. 28, 1999.

(51) **Int. Cl.**[7] .................... **B60Q 1/48**

(52) **U.S. Cl.** .................... **340/932.2**; 340/539; 340/928; 235/378; 235/384; 705/13; 705/418

(58) **Field of Search** .................... 340/506, 539, 340/932.2, 928, 870.02, 870.07, 870.09; 235/378; 194/902; 705/13, 418

(56) **References Cited**

U.S. PATENT DOCUMENTS


| | | | | |
|---|---|---|---|---|
| 5,091,727 A | | 2/1992 | Mahmood | 340/932.2 |
| 5,432,508 A | | 7/1995 | Jackson | |
| 5,504,314 A | | 4/1996 | Farmont | 235/384 |
| 5,648,906 A | | 7/1997 | Amirpanahi | 364/464.28 |
| 5,748,107 A | | 5/1998 | Kersken et al. | 340/905 |
| 5,751,973 A | | 5/1998 | Hassett | 395/213 |
| 5,877,704 A | | 3/1999 | Yoshida | 340/932.2 |
| 5,910,782 A | | 6/1999 | Schmitt et al. | |
| 5,940,481 A | | 8/1999 | Beitman | |
| 6,037,880 A | * | 3/2000 | Manion | 340/932.2 |
| 6,081,206 A | | 6/2000 | Kielland | 340/937 |
| 6,097,313 A | | 8/2000 | Takahashi et al. | 340/905 |
| 6,107,942 A | | 8/2000 | Yoo et al. | 340/932.2 |
| 6,112,152 A | | 8/2000 | Tuttle | |
| 6,124,808 A | | 9/2000 | Budnovitch | 340/932.2 |
| 6,138,072 A | | 10/2000 | Nagai | 701/207 |
| 6,142,702 A | | 11/2000 | Simmons | 404/6 |
| 6,147,624 A | | 11/2000 | Clapper | 340/932.2 |
| 6,148,253 A | | 11/2000 | Taguchi et al. | 701/48 |
| 6,169,897 B1 | | 1/2001 | Kariya | 455/426 |
| 6,202,008 B1 | | 3/2001 | Beckert et al. | 701/33 |
| 6,205,396 B1 | | 3/2001 | Teicher et al. | 701/200 |
| 6,208,934 B1 | | 3/2001 | Bechtolsheim et al. | 701/209 |
| 6,209,026 B1 | | 3/2001 | Ran et al. | 709/218 |
| 6,229,455 B1 | | 5/2001 | Yost et al. | 340/942 |
| 6,230,868 B1 | | 5/2001 | Tuxen et al. | 194/217 |
| 6,236,337 B1 | | 5/2001 | Beier et al. | 340/905 |
| 6,243,029 B1 | | 6/2001 | Tomer | 340/932.2 |
| 6,246,337 B1 | | 6/2001 | Rosenberg et al. | 340/932.2 |
| 6,249,233 B1 | | 6/2001 | Rosenberg et al. | 340/932.2 |
| 6,252,523 B1 | | 6/2001 | Moström | 340/928 |
| 6,253,980 B1 | | 7/2001 | Murakami et al. | 224/510 |
| 6,266,609 B1 | | 7/2001 | Fastenrath | 701/200 |
| 6,272,332 B1 | | 8/2001 | Matsumoto et al. | 455/412 |

FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| FR | WO 98/45823 | 10/1998 | G08G/1/127 |
| WO | WO 97/13222 | 4/1997 | G07B/15/02 |
| WO | WO 98/49665 | 11/1998 | G08G/1/14 |
| WO | WO 99/48062 | 9/1999 | G07F/7/00 |
| WO | WO 00/00942 | 1/2000 | G08G/1/14 |


(List continued on next page.)

OTHER PUBLICATIONS

Jek Kian Jin, *Driver Upgrades,* Life! Section of Straits Times, Jun. 1999, available at http://www.best.com/~kian-jin/sv–life/sv–erpcam.html (accessed Aug. 8,2001).

(List continued on next page.)

*Primary Examiner*—Daryl Pope

(57) **ABSTRACT**

A server transmits parking lot occupancy information over the Internet. The parking lot occupancy information is capable of being reproduced by a remote display device as a real-time representation of the parking lot indicating vacant parking spaces. When presented with the real-time representation of the parking lot, a commuter readily can locate an available parking space or decide to search for parking elsewhere.

**20 Claims, 5 Drawing Sheets**



FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| WO | WO 00/08484 | 2/2000 | ........... G01S/15/93 |
| WO | WO 00/23949 | 4/2000 | ............ G07C/1/30 |
| WO | WO 00/41142 | 7/2000 | ............ G07C/1/30 |
| WO | WO 00/46068 | 8/2000 | ............ B60Q/1/48 |
| WO | WO 00/55816 | 9/2000 | ........... G07B/15/02 |
| WO | WO 00/59201 | 10/2000 | .......... H04M/15/00 |
| WO | WO 01/41029 | 7/2001 | ........... G06F/17/60 |

OTHER PUBLICATIONS

Press Release, Alcatel va intégrer la technologies de Webraska pour fournir des services de cartographie aux utilisateurs de GSM, Jul. 1999, available at http://www.webraska,com/press/99–jul–1–fr.html.

Press Release: Alcatel and Webraska Partner to Provide Location–Based Services to GSM Users, Jul. 1999, available at http://www.mobic.com/news/9907/alcatel__and__webraska__partner__to__.htm.

Johnson City Med–Tech Corridor Its Project, Geographic Information Systems (GIS) Phase I Review and Phase II Prospectus, Oct. 1996, available at http://www.itsdocs.fhwa.dot.gov/%5CJPODOCS%5CREPTS$_{13}$TE/L401!.PDF.

European Commission, West European Local Legal Arrangements for Transport Information Management and Exchange of Data, Apr. 1998, available at http://www.rupprecht–consult.de/wtforeport.pdf and http://www.rupprecht–consult.de/wtfnreport.pdf.

Namgeun Jeong, Youngsu Chae, Aparna Pappu, Shashidhar Merugu, and Ramkumar Krishnan EZPark/RANSY Project, Oct. 1998, available at http://www.cc.gatech.edu/classes/cs6751__98__fall/projects/RANSY/.

Winfried Krux, Peter Hasberg, and Klaus Overkamp, Cologne ParkInfo A Contribution to Traffic Control Compatible with Environment and Urban Development, Presentation on the 5th ITS World Congress, Oct. 1998, available at http://152.99.129.29/cdrom/2147.pdf.

English translation of German web site http://www.koelnverkehr.de available at http://translate.google.com/translate?hl=en&sl=de&u=http://www.koelnverkehr.de/&prev=/search%3Fq%3Dkoeln verkehr%26hl%3Den%26safe%3Doff (accessed Jun. 19, 2001).

Press Release, Schlumberger, Schlumberger and Webraska Partner Up for World's First Demonstration of Hassel–free Parking Using WAP Mobile Phones, Mar. 2000, available at http://www.slb.com/print$_{13}$pr.cfm?prid=1321&printable=1.

Press Release, Mitsui & Co Ltd., Mitsui and Part 24 Establish Tie–Up For Providing Information on Parking Lots and Plan to Offer Related Information on a Real–Time Basis, Jan. 1997, available at http://www.mitsui.co.jp/tkabz/english/news/1997/971park.htm.

Parking Information—Osaka City: Parking space guidance system, ITS Handbook 1998, Section 4: ITS Toward Standard Deployment, available at http://www.its.go.jp/ITS/1998HBook/chapter4/4–8e.html.

*Real Time Traffic Information Systems,* Published as a Supplement to H&T, Mar. 1998.

Peter Hasberg and Dr. Dirk Serwill, The Stadtinfokoln Project in Cologne Information as the Key to Mobility and Traffic Management, ECMT/OECD, Dec. 1999.

Bikash Ron Pati, Evaluation of Parking Guidance Systems: A Unique Approach, 1997, Flite, available at http://uftrc.ce.ufl.edu/fsite/pati.htm.

Keith Gavin, Parking Guidance Comes of Age, Urban Mobilty Professional, Jan. 1999, Issue 7, available at http://docs.vircomnet.com/mobility/parking__vc/Papers__Full__Documents__K.Gavin__0001__0001.htm.

Niko I. Leoutsarako, Management Technology for the Private Parking Industry, Urban Mobility Professional, Jan. 1999, Issue 7, available at http://docs.vircomnet.com/mobility/parking__vc/leoutsarakos0002.htm.

Nikos I. Leoutsarakos, Parking On Street Goes Wireless, Urban Mobility Professional, Jan. 1999, Issue 7, available at http://docs.vircomnet.com/mobility/parking__vc/leoutsarakos0002.htm.

Press Release, Ford Motor company, Ford takes the stress out of city driving, Jun. 1999, available at http://www.media.ford.com/article__display.cfm?article__id=1914.

Andrew Ryder, No Place To Park, Heavy Duty Trucking, Jul. 1999, available at http://www.heavytruck.com/hdt/1999/07/020a9907.html.

Dr. Andreas Scholtz, Parking Technology Beyond the Year 2000, Oct. 1999, available at http://docs.vircomnet.com/mobility/parking__vc/Andreas__Scholtz.doc and http://www.parking–net.com.

Press Release, NETSYSTEC GmbH, Video Broadcast System for Providers, Nov. 25, 1999 available at http://www.netsystec.com/engl/presse/artikel/VS16__PowerEngine.htm.

Press Release, NETSYSTEC GmbH, Video Shuttle by NETSYSTEC being used in Cologne's Traffic Information Service www.koelnverkehr.de, Dec. 25, 1999 available at http://www.netsystec.com/engl/presse/artikel/VS16__koelnverkehr.htm.

Press Release, Shark Byte Systems Inc., New Revenue System Runs Exclusively on the Net, Parking Today, Mar. 2000, available at http://www.sharkbytesystems.com/press/1.htm.

Press Release, Shark Byte Systems, Inc., The Internet Revolution Comes to Parking, Parking, Apr. 2000, available at http://www.sharkbytesystems.com/press/2.htm.

http://www.parking.org/cgi–bin/rbox/get/forums/software.html, hardcopy printout, pp. 1–4.

http://www.parking.org/cgi–bin/rbox/get/forums/software/20.html, hardcopy printout, p. 1.

http://www.parking.org/cgi–bin/rbox/get/forums/software/20/1.html, hardcopy printout, p. 2.

http://www.tele–parking.com, pp. 1–42.

* cited by examiner


10
Controller
11
17
12
18
13
PARKING LOT
14
PARKING LOT
20
19
INTERNET
15
21
16

FIG. 1


100
Controller
11
17
12
13
PARKING LOT
18
19
INTERNET
15
21
175
Display
176
TV Remote
170
Input/Output
169
TV Tuner
168
Communication Device
167
CPU
174
Keyboard
173
PDA
172
Mobile Phone
171
Mouse
162
MEMORY
163
Operating System
164
Authoring Application(s)
165
Client Application(s)
166
Browser Application(s)
161
16
Controller
160

FIG. 2


RETRIEVE STATUS INFORMATION FROM ONE OR MORE PARKING LOTS
S10
PERFORM DATA PROCESSING TO CONVERT STATUS INFORMATION INTO PARKING LOT OCCUPANCY DATA
S20
TRANSMIT PARKING LOT OCCUPANCY DATA OVER THE INTERNET
S30

FIG. 3


ACCEPT SUBSCRIPTIONS FROM A PLURALITY OF SUBSCRIBERS
S100
PROVIDE INTERNET ACCESS TO PARKING LOT OCCUPANCY DATA FOR THE PLURALITY OF SUBSCRIBERS
S200
CHARGE AND BILL SUBSCRIBERS
S300

FIG. 4


File Edit View Favorites Tools Help
Back
Forward
Stop
Refresh
Home
Search
Favorites
History
Mail
Print
Edit
Discuss
Real.com
Address
http://www.openparking.com/metrorail/vienna.html
Go
Links
Vienna MetroRail Parking
September 28, 2000
7:57 a.m.
Lot A
Status : Open
Spaces Remaining : 5
Internet
Start
7:57 AM

FIG. 5

## INTERNET COMMUNICATION OF PARKING LOT OCCUPANCY

This application claims the benefit of U.S. Provisional Application No. 60/156,391, filed Sep. 28, 1999.

### TECHNICAL FIELD

The present invention relates generally to Internet communication. More particularly, the present invention relates to Internet communication of parking lot occupancy data.

### BACKGROUND

Locating a vacant parking space is an ordeal that causes frustration for many commuters. Even if a commuter pays to enter a parking lot, valuable time is consumed searching for a parking space within the parking lot. It seems that parking lots that service hospitals, airports, mass transit stations, entertainment forums, shopping malls, and the like are always the most crowded, when time is the most crucial. As urban and suburban regions become more populated, finding a vacant parking space will become increasingly difficult for commuters.

Several prior art devices have attempted to facilitate locating a parking space. In particular, U.S. Pat. No. 5,293,163 to Kakihara et al. ('163 patent) discloses a system for locating garages with available parking spaces. According to the '163 patent, the location of a parking garage having available parking is displayed in map format.

U.S. Pat. No. 5,432,508 to Jackson ('508 patent) discloses a technique for informing vehicle operators of available parking spaces in a parking garage. According to the '508 patent, light sources mounted above the parking spaces and at the entrance to the parking garage are used to indicate the location of available spaces. The '508 patent also discloses a computer which collects information concerning parking availability and communicates the information to prospective users. Namely, a person can place a telephone call and receive a voice message indicating whether the parking lot is full.

U.S. Pat. No. 5,910,782 to Schmitt et al. ('782 patent) discloses a system for finding available on-street parking using an on-board vehicle navigation system and parking meters equipped with sensing devices. According to the '782 patent, real time metered parking space information can be accessed from a central location or directly by a vehicle, upon entering a specific geographic area.

U.S. Pat. No. 5,940,481 to Zeitman ('481 patent) discloses a parking management control system used to report parking, monitor parking and reserve parking spaces. According to the '481 patent, a user reports parking in a particular parking facility to a central control unit using a personal non-dedicated mobile communications device. The central control unit then confirms whether parking in the particular parking facility is authorized or not. The central control unit also generates a report indicating which parking facilities are supposed to be vacant for law enforcement officials so that unauthorized parking can be ticketed. The '481 patent also discloses that a user can reserve a desired parking facility by selecting a desired parking facility from a map provided from the central control unit. If a potential user, other than the registered user, communicates a request to park in the reserved parking facility, the central control unit transmits a response to the potential user indicating that the parking facility is reserved and not authorized for use.

### SUMMARY

According to the present invention, a server transmits parking lot occupancy information over the Internet. Such parking lot occupancy information is capable of being reproduced by a remote display device as a real-time representation of the parking lot indicating vacant parking spaces. The real-time representation may be in the form of a textual listing, a graphical map, a video image, an Internet Web page or similar form. When presented with the real-time representation of the parking lot, a commuter can readily locate an available parking space or decide to search for parking elsewhere.



### DESCRIPTION OF THE DRAWINGS

FIG. **1** is a block diagram of a communication network.

FIG. **2** is an expansion of the block diagram of FIG. **1**.

FIG. **3** is a flow chart of a communications method.

FIG. **4** is a flow chart of a communications method.

FIG. **5** is a graphical user interface.

### DETAILED DESCRIPTION

FIG. **1** illustrates a communication network **10** according to one embodiment of the present invention. The communication network includes a controller **11** for commanding a server **12** to transmit parking lot occupancy data corresponding to one or more parking lots **13**, **14** through the Internet **15**. For simplicity, only the basic components of the communication network **10** are shown. However, as would be understood by one of ordinary skill in the art, the communication network may include various other components and structures in actual implementation. For instance, although a first parking lot **13** and a second parking lot **14** are shown, the communication network may include only one parking lot or numerous parking lots.

The server **12** may be any type computer, computer system, server, settop box or other type of Internet accessible device and may include any type of hardware, software, application or program capable of functioning as described herein.

As indicated by the broken lines, the controller **11** may be either internal or external to the server **12**. An example a controller **11** is a software application loaded on the server **12** for commanding and directing communications enabled by the server **12**. Other examples include a program, a piece of code, an instruction, a device, a computer, a computer system, or a combination thereof, for independently or collectively instructing the server **12** to interact and operate as described herein. The controller **11** may be embodied permanently or temporarily in any type of machine, component, and/or equipment. The controller **11** transmits commands to the server through a first connection **17**, which may be any communication path capable of carrying commands between the controller **11** and the server **12**.

As shown in FIG. **1**, the server **12** is connected to the first parking lot **13** through a second connection **18**. The second connection may be a serial, modem, telephone, cable, satellite, LAN (Local Area Network) including one or more other computers (not shown) or any other connection capable of carrying data between the first parking lot **13** and the server **12**. The server **12** is also connected to the second parking lot **14** through the Internet **15** through a third connection **19** and a fourth connection **20**. The third connection **19** and the fourth connection **20** may be any type of modem, cable, satellite or other type of connection capable of carrying data through the Internet **15** between the second parking lot **14** and the server **12**. Each of the third connection **19** and fourth connection **20** may also include one or more intermediary computer systems or servers (not shown), such as an ISP (Internet Service Provider).

The first parking lot **13** and the second parking lot **14** may be any parking lot that services a hospital, airport, mass transit station, entertainment forum, shopping mall, department store, grocery store, or the like. Each of the first parking lot **13** and the second parking lot **14** are equipped with detectors (not shown) for detecting the status information for each of the parking lots **13**, **14**. The detectors may be any type of device capable of ascertaining whether a parking space is occupied or not. The detected status information includes at least the location of vacant parking spaces within the parking lots **13**, **14**. The status information, however, may include the occupancy status of every parking space within the parking lots **13**, **14** or any other information concerning the status of the parking lots **13**,**14**. The first parking lot and second parking lot are also equipped with communication devices (not shown) for communicating the status information to the server **12**. The communications devices may be any type of internal or external device such as a computer, server, application, and/or program capable of conveying the status information to the server **12**.

Referring again to FIG. **1**, the server **12** is connected to a remote display device **16** through the Internet **15** through the third connection **19** and a fifth connection **21**. The fifth connection **21** may be any type of modem, cable, satellite or other type of connection capable of carrying data through the Internet **15** between the server **12** and the remote display device **16**.

FIG. **2** illustrates a communication network **100** including a display device **16** communicating with a server **12** through the Internet **15**. The server **12** may include one or more server controllers **11** for controlling the server **12**. Communication pathway **19** and communication pathway **21** enable wired or wireless communication between the server **12** and the display device **16** through the Internet **15**.

The remote display device **16** may be any type computer, computer system, server, settop box or other type of Internet accessible device and may include any type of hardware, software, application or program capable of executing the functions described herein. The remote display device **16** may communicate with the server **12** through the Internet **15** and through wired or wireless communication pathways **19**, **21**. The display device **16** may include applications that enable textual or graphical display of information, such as an email application or an Internet browser application.

The display device **16** may include one or more device controllers **160** for controlling the display device **16**. An example of device controller **160** is a software application loaded on the display device **16** for commanding and directing communications enabled by the display device **16**. Other examples include a program, a piece of code, an instruction, a device, a computer, a computer system, or a combination thereof, for independently or collectively instructing the display device **16** to interact and operate as described herein. The display controller **160** may be embodied permanently or temporarily in any type of machine, component, equipment, storage medium, or propagated signal capable of providing instructions to the client device **16**.

In one implementation, the display device **16** is a portable device, such as, for example, a vehicle-mounted device or a hand-held device. The display device **16** includes a general purpose computer **161** having an internal or external storage **162** for storing data and programs such as an operating system **163** (e.g., DOS, Windows™, Windows 95™, Windows 98™, Windows 2000™, Windows NT™, OS/2, or Linux) and one or more application programs. Examples of application programs include authoring applications **164**



(e.g., word processing, database programs, spreadsheet programs, or graphics programs) capable of generating documents or other electronic content; client applications **165** capable of communicating with other computer users, accessing various computer resources, and viewing, creating, or otherwise manipulating electronic content; and browser applications **166** (e.g., Netscape's Navigator or Microsoft's Internet Explorer) capable of rendering standard Internet content.

The general-purpose computer **161** also includes a central processing unit **167** (CPU) for executing instructions in response to commands from the device controller **160**. In one implementation, the device controller **160** includes one or more of the application programs installed on the internal or external storage **162** of the general-purpose computer **161**. In another implementation, the device controller **160** includes application programs externally stored in and performed by one or more device(s) external to the general-purpose computer **160**.

The general-purpose computer typically will include a communication device **168** for sending and receiving data. One example of the communication device **168** is a modem. Other examples include a transceiver, a set-top box, a communication card, a satellite dish, an antenna, or another network adapter capable of transmitting and receiving data over wired or wireless data pathway **21**. The general-purpose computer **161** also may include a TV ("television") tuner **169** for receiving television programming in the form of broadcast, satellite, and/or cable TV signals. As a result, the display device **16** can selectively and/or simultaneously display Internet content received by communications device **168** and television programming content received by the TV tuner **169**.

The general-purpose computer **161** may include an input/output interface **170** for wired or wireless connection to various peripheral devices. Examples of peripheral devices include, but are not limited to, a mouse **171**, a mobile phone **172**, a personal digital assistant **173** (PDA), a keyboard **174**, an on-board vehicle or PC display monitor **175** with or without a touch screen input, and/or a TV remote control **176** for receiving information from and rendering information to subscribers.

Although FIG. **2** illustrates device such as a mobile telephone **172**, a PDA **173**, and a TV remote control **176** as being peripheral with respect to the general-purpose computer **161**, in another implementation, such devices may include the functionality of the general-purpose computer **161** and operate as the display device **16**. For example, the mobile phone **172** or the PDA **173** may include computing and networking capabilities and function as a display device **16** by accessing the Internet **15** and communicating with the server **12**. Furthermore, the display device **16** may include one, some or all of the components and devices described above.

The operation of one implementation of the present invention will now be described with reference to FIG. **3**.

In response to commands from the controller **11**, the server **12** retrieves status information from one or more of the parking lots **13**, **14** (S**10**). This may entail the controller **11** commanding the server **12** to poll or query the occupancy status of the parking lots **13**, **14** or commanding the server **12** to accept status information periodically sent from the parking lots **13**, **14**.

After the server **12** has retrieved the status information, the controller **11** instructs the server **12** to perform data processing in order convert the status information into

parking lot occupancy data capable of being reproduced by a remote display device **16** (**S20**). Such data processing may or may not be required depending on the form of the retrieved status information.

The controller **11** then commands the server **12** to transmit the parking lot occupancy data over the Internet **15** (**S30**). The parking lot occupancy data corresponds to one or more of the parking lots **13**, **14** and is capable of being reproduced by a remote display device **16** as a real-time representation of the parking lot **13**, **14** indicating vacant parking spaces within the parking lots **13**, **14**. The real-time representation may be in the form of a textual listing, a graphical map, a video image, an Internet Web page or similar form and may indicate occupied parking spaces as well as reserved parking spaces.

Using a remote display device, a commuter can view the real-time representation of the parking lot and can readily locate an available parking space or decide to search for parking elsewhere.

The operation of another embodiment of the present invention will now be described with reference to FIG. **3**. In this embodiment of the present invention, the controller **11** commands the server **12** to accept subscriptions from a plurality of subscribers (S**100**). The controller **11** commands the server **12** to provide Internet accessibility to parking lot occupancy data corresponding to at least one parking lot for the plurality subscribers (**S200**). Subscribers may access the real-time representation through the Internet by visiting a Web site or transmitting an email request, for example. The server **12** may provide access for a fee. Accordingly, the controller **11** may command the server **12** to appropriately charge and bill subscribers (**S300**).

Again, the parking lot occupancy data capable is capable of being reproduced by each of the remote display devices as a real-time representation of the parking lot indicating at least vacant parking spaces within the parking lot. The real-time representation may be in the form of a textual listing, a graphical map, a video image, an Internet Web page or a combination of such forms and may indicate occupied parking spaces as well as reserved parking spaces. FIG. **5** is one example of a graphical user interface that may be displayed to a commuter.

As described above, the present invention will facilitate a commuter's search for a parking space by utilizing the capabilities of the Internet to display a real-time representation of available parking spaces within a parking lot.

It should be understood that the embodiments described above are only examples of the present invention and are not intended to limit the scope of the following claims.

What is claimed is:

**1**. A parking system comprising:

a server that is accessible over the Internet by a subscriber using a wireless communications device; and

a software application that instructs the server to transmit parking data over the Internet to the wireless communications device of the subscriber, wherein

the parking data can be rendered by the subscriber using the wireless communications device as a substantially real-time representation indicating an occupancy condition of an available parking lot, and

the occupancy condition changes according to presence and absence of vacant parking spaces within the available parking lot.

**2**. The parking system of claim **1** wherein the available parking lot comprises a public parking lot.



**3**. The parking system of claim **1** wherein the available parking lot comprises a reserved parking lot for which the subscriber has a reservation.

**4**. The parking system of claim **1** wherein the available parking lot comprises a parking lot in geographic proximity to the subscriber.

**5**. The parking system of claim **1** wherein the available parking lot comprises a parking lot in geographic proximity to a travel destination.

**6**. The parking system of claim **1** wherein the available parking lot comprises at least one of an airport parking lot, a hospital parking lot, a mass transit station parking lot, an entertainment forum parking lot, and shopping mall parking lot.

**7**. The parking system of claim **1** wherein the real-time representation comprises a map identifying a location of at least one available parking lot having an occupancy condition corresponding to at least one vacant parking space being present within the available parking lot.

**8**. The parking system of claim **1** wherein the real-time representation comprises a map identifying a location of at least one available parking space within an available parking lot having an occupancy condition corresponding to at least one vacant parking space being present within the available parking lot.

**9**. The parking system of claim **1** wherein the real-time representation comprises a Web page.

**10**. The parking system of claim **1** wherein the real-time representation comprises number of vacant parking spaces present within the available parking lot.

**11**. The parking system of claim **1** wherein the wireless communications device comprises a vehicle-mounted device.

**12**. The parking system of claim **1** wherein the wireless communications device comprises a hand-held device.

**13**. The parking system of claim **1** wherein the subscriber is associated with a wireless service provider.

**14**. The parking system of claim **1** wherein the subscriber is associated with an Internet service provider.

**15**. A parking system comprising:

a server that is accessible over the Internet by a display device; and

a software application that instructs the server to transmit parking data over the Internet to the display device, wherein

the parking data can be rendered by the display device as a substantially real-time representation indicating an occupancy condition of an available parking lot,

the occupancy condition changes according to presence and absence of vacant parking spaces within the available parking lot, and

the real-time representation comprises a map identifying a location of at least one available parking space within an available parking lot having an occupancy condition corresponding to at least one vacant parking space being present within the available parking lot.

**16**. The parking system of claim **15** wherein the available parking lot comprises at least one of a public parking lot and a reserved parking lot.

**17**. The parking system of claim **15** wherein the available parking lot comprises a parking lot in geographic proximity to a travel destination.

**18**. The parking system of claim **15** wherein the available parking lot comprises at least one of an airport parking lot, a hospital parking lot, a mass transit station parking lot, an entertainment forum parking lot, and a shopping mall parking lot.

**19**. The parking system of claim **15** wherein the real-time representation comprises a Web page.

**20**. The parking system of claim **15** wherein the real-time representation comprises a map identifying a location of at least one available parking lot having an occupancy condition corresponding to at least one vacant parking space being present within the available parking lot.

* * * * *

CERTIFICATE OF FILING AND SERVICE

I, Robyn Cocho, hereby certify pursuant to Fed. R. App. P. 25(d) that, on September 19, 2016 the foregoing Brief for Plaintiff-Appellant was filed through the courts CM/ECF system:

Ryan J. McBrayer
Jonathan Lee McFarland
Stevan R. Stark, Jr.
1201 Third Avenue
Suite 4900
Seattle, WA 98101
*Attorneys for Defendant-Appellee*

In addition, the required 6 copies will be sent to the court upon approval.

/s/ Robyn Cocho

Robyn Cocho

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS AND TYPE STYLE REQUIREMENTS**

1. This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B).

__x__ The brief contains __7,815__ words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii),or

_____ The brief uses a monospaced typeface and contains lines of text, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6).

__x__ The brief has been prepared in a proportionally spaced typeface using MS Word 2002 in a 14 point Century Schoolbook font or

_____ The brief has been prepared in a monospaced typeface using MS Word 2002 in a ___ characters per inch_________ font.

Stanley M. Stein
STANLEY M. STEIN, P.C.
445 Ft. Pitt Blvd.
Suite 150
Pittsburgh, PA 15219
412-904-4573

By *__/s/ Stanley M. Stein__*
Stanley M. Stein

*Attorney for Plaintiff-Appellant*